Harry MIGIAS, Administrator of the Estate of George Migias, Deceased, Plaintiff

v.

UNITED STATES of America, Defendant and Third Party Plaintiff (M. A. MALAMOS and George Atsalis, Individually and Trading as Malamos & Atsalis, a partnership, Third Party Defendants).

Civ. A. No. 13469.

United States District Court
W. D. Pennsylvania.
July 25, 1958.

---

Manos & Camarinos, Pittsburgh, Pa., for plaintiff.

Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa., for Government.

WILLSON, District Judge.

Plaintiff brought suit against the Government under the Federal Tort Claims Act. In its answer, the Government admits that jurisdiction of this court is conferred under the provisions of that Act, being 28 U.S.C.A. § 1346(b). After the suit was filed, defendant by motion and order under Rule 14 brought in M. A. Malamos and George C. Atsalis, individ-

ually and trading as Malamos & Atsalis, a partnership, as third party defendants.

The facts and the conclusions of law will be found in this opinion pursuant to the provisions of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A., and they follow: On June 18, 1954, defendant acting through the Pittsburgh District Corps of Engineers, U. S. Army, entered into a written contract with M. A. Malamos and George C. Atsalis for painting the back channel service bridge, Emsworth Lock and Dam, Ohio River, Pennsylvania. George Migias was an employee of the contractors Malamos & Atsalis. While at work on the dam at Emsworth for his employers on July 28, 1954, decedent met his death when he fell from a wooden scaffold suspended from a crane into the Ohio River and drowned. Plaintiff is the administrator of the estate of the decedent George Migias. Decedent was unmarried. He is survived by his father, Harry Migias, his mother, Jane Migias, three adult married sisters, one single sister and an adult brother. At the time of his death he was twenty-five years of age, weighed 165 pounds, was in good health except for an ulcer, and lived with his parents in their home in the City of Pittsburgh.

The parties litigant have agreed that the contract was executed in Pennsylvania and that the substantive law of Pennsylvania is the law to be applied in this case.

The decedent at the time of his death was working upon a swinging scaffold or platform 76″ x 73″ x 33″ which was constructed by an employee of the defendant, the United States Government, in 1942, owned by the defendant, used by the defendant's employees in connection with the inspection and maintenance of the bridge at the Emsworth Dam, and loaned to the contractors for the purpose of painting the bridge. It was constructed of fir lumber; the vertical posts were made of four inch by six inch lumber fastened with spikes, railings were of 2″x 4″ boards fastened with spikes, with diagonal braces constructed of 2″ x 6″ boards fastened with spikes. The scaffold was suspended from a crane supported by a steel cable leading from four eyebolts three feet long fastened to the 4″ x 6″ joists with nuts and washers. The scaffold had never been painted, nor had any protective coating been applied to it. When it was not in use, it was kept by defendant on the top of the bridge in the open weather.

Although the contract provided that the contractors would provide all equipment, an oral agreement was made whereby defendant loaned this particular scaffold to the contractors to be used by them and their employees in performing the contract work, because this was the first bridge and dam painting project undertaken by the contractors Malamos and Atsalis, and they had no scaffolding or other suitable equipment to use in the work.

Decedent's co-worker on the scaffold at the time of the accident was Clyde J. Clark, Jr. About 3:50 P.M., on a clear day, decedent and Clark were about to quit work for the day. They had been using the scaffold suspended over the side of the bridge and had signaled to the crane operator, who was out of their view, that they were ready to be pulled to the deck. Clark did not observe decedent actually commence his fall, but from his testimony it can be inferred that as decedent leaned back to signal the craneman to hoist the scaffold, the wooden railing came apart, causing the decedent to plunge into the river and drown. The decedent fell to the river at the upstream side, very close to the lock, with only about one inch of water flowing over the dam. He fell about 33 feet into the water and did not come to the surface, although Clark saw him struggling to swim up. There is a section about 12½ feet below the surface of the water in back of the dam where water goes through tunnels or gates about 30 inches high. At the point of the fall, the water creates an undertow and this took decedent's body downward. And though de-

cedent struggled, as observed by Clark, he was caught in the undertow in the sill of the tunnel and even though the water was low at that time of the year and immediate rescue operations were engaged in, the body was not recovered for some time after the accident. Plaintiff's Exhibits 3 and 4, showing the dam, were most helpful in noting the reason for the undertow and the several photographs of the scaffold and its manner of use which were introduced into evidence are most revealing. An inspection of the photographs, together with the other evidence, leads this court to conclude that the scaffold was not properly designed or built for use some twelve years after its construction on this particular painting job. Further, it was not in a good state of repair at the time it was put into use by the contractors. Eyebolts on four corners of the scaffold to which were attached wire lines on use tended to draw the boards inward or together, thus putting a strain upon the wooden railings and corner posts which had been exposed to the atmosphere for some twelve years. The portion of the railing which gave way fell into the river with the decedent. Where the railing came apart, the spike holes had rotted so that the spiking did not hold the rail or braces together.

The photographs of the point where the rail gave way showed decayed wood where the planking had been nailed to the upright posts. Further, the spiking had been done from the inside out, so that any push against the rail from the scaffold tended to push the rail, not against the head of the spike but towards its point, or outward. Because of the manner of construction, that is by nailing of boards or planks only, without a surrounding support and the resulting decay because of being exposed to the weather, the sides of the rails of the scaffold were loose and easily gave way. Especially after the railing had been further loosened by the strain of the cable pulling the four corners together in the use of the scaffold by the contractors and their employees.

On July 21, prior to the accident, a meeting was held on the deck of the bridge over the dam at which Government representatives, particularly Government Safety Engineer Kissell and the contractor George Atsalis inspected the scaffold. The Safety Engineer noted at that time that the railing was loose and indicated to the contractor that it was up to him to maintain and keep the scaffold in good repair. The Safety Engineer's words were, "I told him that it was his responsibility to maintain it and that he must maintain it as frequently as necessary, maybe daily, maybe more often than daily." Atsalis, the contractor in charge of the work, made inspection of the scaffold, prior to its use by decedent. There is evidence that Clark and decedent made some repairs to the scaffold before using it on the afternoon of the accident. On the morning of that day, decedent and Clark had not used the scaffold, but it had been used by Mr. Atsalis. However, the repairs made to the scaffold consisted mainly of driving more nails or spikes into the wood in an attempt to make more secure the boards or planks making up the railing or siding of the scaffold. Mr. Kissell made no reference to any specific repairs, nor did he suggest surrounding the outside of the railing with a wire cable to hold the rails in place. The men discussing repairs all seemed to have in mind that the only thing to do was to drive more nails into wood which was already in the process of decay and thus it should have been apparent that the nails would not do the job.

It is to be noticed at this point that this court is proceeding under the principle of law found in the Restatement under Torts, Negligence, Section 392. In this section under Comment, Illustrations: 1 reads as follows:

"1. A employs B, a painter, to repaint his residence. The contract provides that B be allowed to use the ladders which A has upon his premises. C, an employee of B, while using one of these ladders, is hurt by a defect which although

not readily observable, could have been discovered by the exercise of a reasonably careful inspection. A is liable to C."

Section 392 of the Restatement as cited is believed to be the substantive law of Pennsylvania, as the Pennsylvania appellate courts usually follow the Restatement.

The evidence indicates that the scaffold had been used on at least several occasions by the contractors and their men prior to the accident to Migias. There was some variance in the evidence as to whether decedent had been upon the scaffold prior to the afternoon in question. Clark said they had worked on it six or seven times. Atsalis, on the other hand, indicated that the afternoon in question was the first occasion that decedent had worked from the scaffold. The number of times the scaffold had been used by decedent has some bearing on the issue of contributory negligence. Defendant has set up contributory negligence as a defense and had the burden to prove it by a fair preponderance of the evidence. Proof on this phase of the case is wanting insofar as this defense is concerned. The situation is presented where an employee of a contractor is required to use equipment furnished by the Government. As noted in the illustration found in the Restatement, the fact is that the defects were not readily observable but could have been discovered by the exercise of a reasonably careful inspection. It is the opinion of the court that the Safety Engineer Kissell was aware that the scaffold was very apt to weaken under the intended use. He warned the contractor as to inspection and repair. The scaffold, built in 1942, had been subject to weather for a period of at least twelve years. Decay of the wood was inevitable. It was apparent from the testimony that pounding more nails into the boards was insufficient precaution. But that was all that was expected of the contractor, decedent or his co-worker. A wire cable put around the outside of the railing would have prevented the outward collapse of the railing. This is what the Government did do after the accident, but it should have been done before. Under all the evidence, I find that the United States was negligent in permitting the contractors to use the scaffold under the circumstances shown in the evidence. The testimony and the photographs clearly show that decedent's fall was caused by the collapse of a rickety piece of equipment, which by aging and weather had become dangerous for the use intended.

Defendant contends that decedent was contributorily negligent in not wearing a lifesaving belt or equipment. I believe the answer to that contention is that a life belt would not have prevented the fall and it is apparent that under conditions in the water it is mere speculation to contend that a life belt would have prevented decedent from drowning. He was pulled under the water by great suction. He only fell a comparatively few feet. His co-worker saw him struggling in the water, indicating that he was not unconscious from the fall, but the tragic part of the accident was that the point where he struck the water was so close to the lock or tunnel as to prevent him from struggling to the surface and thus extricating himself. The rescuers had to expend considerable effort to free the body from where it was lodged. I find that no contributory negligence is to be found against decedent because of failure to wear a life belt.

*Damages:* Plaintiff as administrator is claiming damages under both the Pennsylvania Wrongful Death Act of 1855, 12 P.S. § 1601 et seq., and the Survival Act of 1937, 20 P.S. c. 3 Appendix, § 771 et seq. Also, a claim is made for the funeral and burial expenses. The evidence as to damages under the wrongful death statute supports a moderate award on behalf of the surviving parents. As indicated, decedent was a single man, twenty-five years of age, and had recently returned from the military service.

While in service, he had contributed $50 a month to his mother. Since return from the service, he had regularly given his parents $30 to $35 each week. He made his home with his parents, which was owned by them, but he had contributed $700 to its purchase. He also took care of repairs to the home in addition to the monetary contributions. Decedent's earnings for the calendar year 1953 were $4,786. His father, age 65, was retired and living on a miner's pension of $100 a month. His mother, although her age was not given, appeared as a witness and seemed to be approximately the same age as her husband. The life expectancy of a 65 year old white male is a minimum of 12.9 years. Under the evidence, having due regard to Pennsylvania law with reference to the principle of present worth, I find $4,500 is a reasonable sum to award decedent's parents as damages under the Wrongful Death Act.

The administrator is entitled to recover the expenses of funeral, burial and monument in the total sum of $1,426.95, which items are reasonable. Under the Survival Act, plaintiff is entitled to recover for the estate the decedent's earnings during his normal life expectancy, less the reasonable cost of his maintenance and other normal expenditures made during his lifetime. Under the evidence, considering the age of the decedent his life expectancy of 45 years, his demonstrated energy and earning ability, applying the principle of present worth, I award damages to the plaintiff under the Survival Act in the amount of $15,000. The three items of damages mentioned make a total award to the plaintiff in the sum of $20,926.95.

*Discussion of Law and Liability of Third Party Defendants:* As previously indicated, the principle of law which renders defendant United States liable to the plaintiff is that expressed in the Restatement of Torts. In addition, counsel for plaintiff has cited Pennsylvania cases which he claims are in point and which support findings and conclusions in favor of plaintiff. Among those cases are: Hoffner v. Prettyman, 6 Pa.Super. 20; Scalise v. F. M. Venzie & Co., Inc., 301 Pa. 315, 152 A. 90; Sorrentino v. Graziano, 341 Pa. 113, 17 A.2d 373; and Continental Can Co. v. Horton, 8 Cir., 250 F. 2d 637. I find under the evidence that the relationship between the defendant and the contractor, the scaffold being a chattel, is that of bailor and bailee for the mutual benefit of both. In many of the decisions cited by counsel for plaintiff and also counsel for defendant, reference is made to the duty of a land owner to business visitors or invitees. The law in this respect is clear but not entirely applicable to the facts of the instant case. There is in this case an instrumentality, that is a chattel, dangerous for the intended use. Several cases under Section 392 of the Restatement, Pennsylvania Annotations, discusses this problem. It cannot be doubted but that a scaffold on which men were to work in the air above a river should be fit for use, that is, free from any defects which could reasonably be foreseen to cause harm if the scaffold was not in proper condition. No doubt the railing about the floor of the scaffold in the first instance was sufficient, but over the years such an instrumentality naturally in the course of use and by the passage of time became inherently dangerous when put under the stress and strain of being raised and lowered by a crane as was done in this case.

Defendant contends that any notice of defect in the scaffold to the contractor was chargeable to the employee, George Migias, with the result that he is contributorily negligent as a matter of law. As plaintiff aptly points out, however, there was no notice of any specific defect given by the Government employees to the contractors or their employees. The Government's evidence that it had insisted that it was the contractor's duty to maintain the scaffold falls far short of supporting its contention that it had pointed out defects to the contractor, notice of which was binding upon the contractor's employees.

The Government cites in support of its contention, Valles v. Peoples-Pittsburgh Trust Co., 339 Pa. 33, 13 A.2d 19; and Engle v. Reider, 366 Pa. 411, 77 A.2d 621. The cited cases are not in point. In the instant case it is the inherent defect of the scaffold itself, because of its age and general deterioration under weather conditions that made it unsuitable for the job and thus a dangerous piece of equipment. Moreover, in a later case, Cooper v. Heintz Mfg. Co., 385 Pa. 296, 122 A.2d 699, the contention raised by the defendant was held to be a jury issue.

But what has been said as to the Government's negligence is equally applicable in determining that the third party defendants were negligent in directing decedent to use the scaffold in the performance of his work. The principle is one of concurrent negligence. See Potere v. City of Philadelphia, 380 Pa. 581, 112 A.2d 100.

■ However, the third party defendants, as shown by the evidence, were subject to the Workmen's Compensation Law of the Commonwealth of Pennsylvania, 77 P.S. § 1 et seq. Under Maio v. Fahs, 339 Pa. 180, 14 A.2d 105, and other cases, the limit of its liability as a third party defendant is the maximum compensation to be paid under the Pennsylvania statute.

■ The remaining question is whether under the written contract there is an indemnity agreement between the parties whereby the third party defendants became liable to the Government for all of the damages. The Government relies on the indemnity provision in the contract, Defendant's Exhibit 1, pages 3 and 4, which reads:

"In the event the contractor elects to use the crane service under the conditions specified above: (a) The contractor shall indemnify, hold harmless and defend the Government against any claims, demands or liabilities against the Government arising out of the use or operation of the crane during the performance of this contract, excepting only claims for injuries to Government employees not due to the fault or negligence of the Contractor; and (b) The planning, method of procedure, progress, supervision, or conduct of the work upon which the crane is engaged shall at all times be the responsibility of the contractor, and the Government shall not be in any way liable or responsible therefor."

The Government contends that under the paragraph quoted the compensation law of Pennsylvania did not come into play, nor would the fact that the indemnitee, the United States, is found negligent require any different result. However, I cannot construe the indemnity provision of the contract as covering the use of the scaffold. The quoted paragraph refers to the use of the crane service. The written contract provided that the contractor could make use of the crane service if he so desired. The use of the scaffold was simply an oral understanding reached by the parties. The parties had a discussion as to the maintenance and repair of the scaffold, but no discussion as to liability in the event of the collapse of the scaffold. It is true they did indicate that it was subject to all terms and conditions of the paragraph concerning the crane service. Two recent decisions of the Court of Appeals of this Circuit are in point. One is Brown v. Moore, 3 Cir., 247 F.2d 711, wherein the Court of Appeals followed Perry v. Payne, 217 Pa. 252, 66 A. 553, 11 L.R.A., N.S., 1173. In that case the Supreme Court of Pennsylvania held that indemnity against personal injuries should not be construed to indemnify against the negligence of the indemnitee unless it is so expressed in unequivocal terms. I find in the evidence in the instant case that there is no such expression. See also the very recent opinion of Judge Goodrich in Frankel v. Johns-Manville Corp., 3 Cir., 257 F.2d 508.

Counsel will submit an order for judgment in accordance with this opinion.