327 F.2d 701
 Barbara P. WISEMAN, Administratrix of the Estate of Boyd Lee Wiseman, Deceased,
v.
UNITED STATES of America,
v.
CITY SERVICE CLEANING CONTRACTORS, INC., and Zurich Insurance Company, Zurich Insurance Company, Appellant.
Barbara P. WISEMAN, Administratrix of the Estate of Boyd Lee Wiseman, Deceased,
v.
UNITED STATES of America,
v.
CITY SERVICE CLEANING CONTRACTORS, INC., and Zurich Insurance Company, United States of America, Appellant.
 No. 14363.
 No. 14424.
 United States Court of Appeals Third Circuit.
 Argued October 18, 1963.
 Decided February 18, 1964.
 
 Robert E. Wayman, Pittsburgh, Pa., for appellant Zurich Ins. Co.
 Edward Berlin, Dept. of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Gustave Diamond, U. S. Atty., Sherman L. Cohn, Edward Berlin, Attys., Dept. of Justice, Washington, D. C., for the United States.
 Edward J. Balzarini, Alexander L. Suto, Samuel L. Goldstein, Suto, Power, Goldstein & Walsh, Pittsburgh, Pa., for appellee Barbara P. Wiseman.
 Louis T. Katusin, Associate Counsel, Judson E. Ruch, Chief Counsel, State Workmen's Ins. Fund, Walter E. Alessandroni, Atty. Gen. of Pennsylvania, for City Service Cleaning Contractors, Inc.
 Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.
 FORMAN, Circuit Judge.
 
 
 1
 In the present case Barbara P. Wiseman, the widow of Boyd Lee Wiseman and the administratrix of her husband's estate, brought a suit against the United States under the Federal Tort Claims Act.[1] She has claimed damages under Pennsylvania's Wrongful Death Act[2] and Survival of Action Statute.[3] The essence of her complaint alleges that the Government's negligent maintenance of a window on the fifth floor of the eleven story Victory Building in Pittsburgh, constructed in 1903, caused that window to become loose from its frame, which in turn resulted in the decedent's falling to his death as he was cleaning the window. The United States answered, denying the claim of negligence and alleging that decedent was contributorily negligent.
 
 
 2
 The United States brought in the decedent's employer, City Service Cleaning Contractors, Inc. (hereafter City Service), as a third party defendant, charging it with (1) being either the sole or joint proximate cause of the accident, by reason of its alleged failure to warn decedent of the dangerous condition of the window or to instruct and supervise him properly in performing his work and (2) with having agreed, under the terms of its contract, to be responsible for all damages resulting from its negligence.
 
 
 3
 The United States also brought in Zurich Insurance Company (hereafter Zurich), as a third party defendant, charging it with an obligation to pay damages to the plaintiff by reason of an insurance policy taken out by City Service to cover any Government liability with respect to the window cleaning operation.
 
 
 4
 City Service answered, alleging that its liability is limited to the requirements of the Workmen's Compensation Act of Pennsylvania. Zurich answered, denying any obligation on the insurance contract, because the United States, it contends, did not report the accident or claim until five months after the occurrence of the accident, in violation of the insurance contract.
 
 
 5
 The District Court held that "the negligence of the United States in maintaining the Victory Building and, particularly the window in Room 501-502 thereof, in a dangerous condition" together with City Service's "inadequate instruction" and failure to furnish decedent "a reasonable safe place to work" jointly caused the accident in question. It further held that the decedent was not contributorily negligent. Plaintiff was awarded judgment against the United States for a total of $41,171 — $39,171 under the Pennsylvania Wrongful Death Act and $2,000 under the Pennsylvania Survival of Action Statute.
 
 
 6
 The District Court also rendered judgment for the United States against (1) City Service "to the extent of contribution allowed under the law in view of the fact that the liability of City Service Cleaning Contractors, Inc., is limited under the Pennsylvania Workmen's Compensation Act" and (2) Zurich Insurance Company for $41,171 by virtue of the insurance policy.
 
 
 7
 The United States has appealed the finding that it was negligent and that the decedent was free from contributory negligence. Zurich has appealed both the finding that the accident was the result of negligence and that the United States could recover under the contract of insurance. City Service has not appealed.
 
 
 8
 The pertinent facts, as found by the District Court, and viewed in the light most favorable to the appellee, as they must be at this stage of the proceedings, are the following:
 
 
 9
 At the time of the fatal accident the United States owned and controlled, through the General Services Administration (hereafter GSA), the Victory Building. Various agencies of the Government maintained offices there.
 
 
 10
 From September 1, 1956 through August 31, 1961, the GSA entered into written contracts with City Service to clean windows of the building. One of the clauses of the contract provided that City Service "shall be responsible for all damage to persons or property that occur as a result of its fault or negligence in connection with the prosecution of the work." The contract also required the contractor to add the United States as a named insured on its policy covering performance of the window cleaning services.[4] The United States was so added to the City Service insurance policy with Zurich.
 
 
 11
 On January 18, 1960, City Service first employed the decedent as a window cleaner. He was born September 17, 1939. Upon graduating from High School, he had enlisted in the United States Marine Corps and was on active duty for six months. He thereafter worked in a gasoline station at Nutter Fort, West Virginia, and also as an oiler on a coal stripping job at Bridgeport, West Virginia. The decedent married the appellee on February 27, 1959. A child, Lee Ann Wiseman, was born of this marriage on July 4, 1961. Decedent's wife has subsequently remarried.
 
 
 12
 Pursuant to the contract with the Government, City Service assigned decedent and John Jaros to clean the windows of the Victory Building on Saturday morning, March 25, 1961. This was the first occasion that decedent had cleaned windows there, though he had been in the employ of City Service for approximately 15 months.
 
 
 13
 Clarence J. Vexler, President of City Service, testified that he realized most of the windows were not equipped with safety hooks and that because of a five foot overhang from the roof, scaffolding could not be used. Mr. Vexler also conceded that he definitely knew several of the windows were in a defective condition. Although he had never received any of the Government's inspection reports, which showed the extremely dangerous condition of the windows, he said he was "guided by our [City Service's] own inspection in preference to any inspector employed by any one else."
 
 
 14
 At City Service's monthly safety meetings, Mr. Vexler instructed all employees, in general, how to clean windows. The decedent had attended approximately a dozen of these meetings. On the day before the accident, John Veltri, a foreman of City Service, advised decedent that he would be spending the following day at the Victory Building and that its "windows were a different type than he had been used to." These windows, Mr. Veltri informed the decedent, should be cleaned "from the inside." Mr. Jaros also testified that prior to their being dispatched to the building, Mr. Veltri had instructed them to clean the windows from the inside.
 
 
 15
 Upon beginning work at the building, at 6:00 a.m. of March 25, 1961, Mr. Jaros stated that he had informed the decedent how to clean the windows. But instead of cleaning the windows from the inside, Mr. Jaros, himself, cleaned some of the windows by sitting on the outside sill. Furthermore, it was adduced that decedent could have observed Mr. Jaros cleaning the windows in this manner.
 
 
 16
 Mr. Jaros stated that the decedent cleaned some of the windows from the outside. A possible reason for cleaning the windows from the outside, instead of the safer inside method, was brought out at the trial: City Service's employees received pay for a certain number of hours regardless of how long they actually worked on the job and it took less time to clean the windows from the outside than from the inside.
 
 
 17
 The decedent and Mr. Jaros washed the windows of the sixth through the tenth floors. While the decedent was cleaning or preparing to clean a double-hung window in the News Service Office of the United States Department of Agriculture, in Room 501-502 at about 11:30 a. m., Mr. Jaros was similarly engaged in an adjoining room. At about that time decedent fell to his death. The District Court concluded: "This window came out of the sash which caused the decedent to be thrown to the pavement five stories below which fall caused his death."
 
 
 18
 The double-hung tilt sash southerly window from which decedent fell measured six feet high and four feet 2 inches wide. After the accident, the glass was still unbroken and the upper portion of the window had been cleaned.
 
 
 19
 Upon hearing the screams of the decedent, Mr. Jaros rushed to the sidewalk. There, he looked up and saw, according to his testimony, the window hanging on a slant. A guard for the GSA, Herman L. Smith, stated that when he went to Room 501-502 after the accident, the window had been pulled away "about a foot" from the sash. Scratch marks, it was adduced, appeared on the channel of the window.
 
 
 20
 William D. Best, a detective for the City of Pittsburgh, testified that when he arrived at the scene, the chain on the right side of the window, which is used to lower and raise it, was broken away from the sash weight.
 
 
 21
 Messrs. Jaros and Best testified that they did not see decedent's bucket on the street, but did see his sponge there. Scrutiny of the testimony has failed to reveal what, in fact, happened to decedent's bucket.
 
 
 22
 Neither this window nor the windows between the third and tenth floor have hooks or anchors or facilities for scaffolds. Moreover, none of these windows, the District Court found, had "any of the approved safety devices" required under the Pennsylvania Health and Safety Act[5] and under the Regulations for Cleaning Windows promulgated by the Department of Labor and Industry.
 
 
 23
 Some seven reports, submitted between 1952 and 1960, by engineers who inspected the buildings and made recommendations thereon on behalf of the Government, brought home to the United States the knowledge that the state of the windows was in utter disregard of human safety. There was also evidence that the Government's representatives repainted the frames and sashes of the windows including those in Room 501-502, thereby concealing their condition and compounding the danger.
 
 
 24
 James DeBow, a safety inspector of the Pennsylvania Department of Labor and Industry, stated that when he visited Room 501-502 on the second day after the accident, he could see that the windows in the building were in bad shape from watching another person lift and tilt them.
 
 
 25
 He characterized the condition of the window in the following manner:
 
 
 26
 "A. Well, I observed that the window frames and casing from where this fatal accident occurred was very loose. You could almost push it out yourself. And I noticed the chain was broken or loose from the sash and was hanging down, and it is from there that I —"
 
 
 27
 * * *
 
 
 28
 "A. Oh, the woodwork had deteriorated. It was in a very bad condition, that window and all windows in that vicinity."
 
 
 29
 Clearly, the windows in the building were direly in need of repair. As concluded by the District Court:
 
 
 30
 "[T]he framework was dry rotted, the threads of the safety rods were stripped, chains were broken, swivels which tilted the windows were set in rotted woodwork, the frames and swivel bases were split, objects blocked the tilting of some windows, the window frames were cracked, handles on many windows were missing, rusty chains in the windows were repainted, and bolts on safety rods were missing."
 
 
 31
 Following the tragedy of March 25, 1961, Mr. Vexler wrote a letter[6] on March 30, 1961, to the firm of McCloskey and O'Neil, agents of the Zurich Insurance Company, informing it of the fatal accident. Their reply,[7] a copy of which was received by Zurich, on April 4, 1961, stated that they were notifying Zurich thereof. It is a common practice for clients to notify the agents of Zurich to fulfill the requirement of notice.
 
 
 32
 On April 14, 1961, appellee's attorney sent a letter to the office of the United States Attorney in Pittsburgh, Pennsylvania, advising of its claim arising from the death of the decedent. The Government thereupon commenced an investigation of the accident. Appellee filed her complaint on May 17, 1961.
 
 
 33
 Sometime during August of 1961, Samuel J. Reich, then a special attorney in the office of the United States Attorney, informed McCloskey and O'Neil by telephone of the suit by appellee. The Government gave written notice to Zurich, according to the finding of the District Court, in "the last few days of August or the first few days of September 1961."
 
 
 34
 The Government, Zurich charges, neglected to give prompt notice of the accident, as required by the insurance policy.[8] The District Court found that Zurich "did in fact have notice of this accident within a reasonable period of time inasmuch as the employer of the decedent notified [third party] defendant Zurich Insurance Company's agent." The District Court additionally found that "Zurich suffered no prejudice whatsoever by any action of the Government."
 
 I.
 
 35
 The first issue to be decided is whether it was clearly erroneous for the District Court to find that the Government's negligence together with City Service's negligence jointly caused the death of the decedent.
 
 
 36
 A finding of negligence may not "be set aside unless clearly erroneous, regardless of what we, if charged with the responsibility of the finding in the first place, would have found."[9] This well known rule of law must be borne in mind in connection with any analysis of the District Court's findings that the Government and City Service jointly caused the fatal accident.
 
 
 37
 The Government, manifestly, knew of the dangerous condition of the windows in the Victory Building. Hiring City Service, an independent contractor, to clean the windows of the building obligated the Government, ordinarily, to make the premises safe for the contractor's employees or to give them adequate warning of known dangerous conditions that are not likely to be discovered by the employee.[10] But in Pennsylvania, it appears that a landowner may owe no duty to an employee of a contractor, where the contractor is in sole control of the work location and is as cognizant as the owner of any dangerous conditions thereon.[11]
 
 
 38
 The Government failed to disclose to City Service its many inspection reports or the information contained therein revealing the extremely dangerous condition of the windows of the Victory Building. In addition, by painting the window frames and appurtenances, it concealed the dangerous defects. Thus, even though City Service realized the inadequate safety features of the window, it may well have been ignorant of the full measure of the danger involved.
 
 
 39
 Moreover, the record lacks the testimony necessary for a finding that City Service exercised sole control of the work location. Indeed, in the window cleaning contract between the parties, the Government required City Service to meet certain conditions on the work location, e. g.:
 
 
 40
 "No hooks are available. Scaffolding is required to clean about ¼ of the windows in the building. Standard ladder may be used for same and balance of windows may be cleaned by tilting the windows."
 
 
 41
 * * *
 
 
 42
 "Before performing any schedule work, notification must be given to the Government's Representative at the site and his approval secured."
 
 
 43
 Government employees also, in fact, admitted the decedent and Mr. Jaros to the premises on the fateful Saturday. It is apparent that City Service was never in sole control of the work location.
 
 
 44
 The Government neither completely disclosed the full danger of the windows nor gave City Service sole control of the work location. Therefore, the Government owed the duty of exercising reasonable care to the decedent.
 
 
 45
 The District Court's finding that the Government breached this duty by negligent maintenance of the window in Room 501-502, thus causing decedent's death, is not clearly erroneous.
 
 II.
 
 46
 Though the 21½ year old decedent had worked as a window cleaner for 14 months, he was relatively inexperienced in this particular kind of window cleaning operation. Furthermore, before March 25, 1961, he had never cleaned windows in the Victory Building.
 
 
 47
 The United States never fully informed City Service of all that it knew about the defective condition of the windows. City Service was, however, still cognizant of some of the extreme danger that its employees, and especially this young employee, whom Mr. Jaros had to guide, would encounter by cleaning these defective windows. Accordingly, either it owed decedent an obligation to warn him about the dire risk that cleaning the windows would present, or it owed him an obligation of providing a safe place to work. It would appear that City Service did neither the former nor the latter, in its entirety. In any event the District Court's finding that City Service was also a proximate cause of the decedent's death is not clearly erroneous.
 
 III.
 
 48
 The claim that the District Court erred, in concluding that the decedent was not contributorily negligent, lacks merit. There was testimony by Mr. Smith that the window had been pulled away about a foot from the sash. Moreover, it was adduced that after the accident the window was unbroken and that only the decedent's sponge, not his bucket, was on the street. A legitimate inference may thus be drawn that the pressure applied to the window from the decedent's inside cleaning caused the window to be pulled away from its frame. The decedent thereupon, it could be reasonably deduced, fell to his death five stories below.
 
 
 49
 Even assuming that decedent was cleaning the windows from the outside, it does not necessarily follow that he was contributorily negligent. After all, both the Government and City Service failed to properly advise him of the full measure of danger inherent in any cleaning of the windows and Mr. Jaros, a co-employee for City Service, who was to instruct the young, relatively inexperienced decedent, cleaned the windows himself from the outside.
 
 
 50
 The facts and circumstances herein preclude a ruling that the District Court was clearly erroneous in finding that the decedent was not contributorily negligent.
 
 IV.
 
 51
 City Service's insurance policy, obtained for its benefit and the Government's, required the insured to give Zurich written notice as soon as practicable of any accident occurring during the window cleaning operations.[12] And if a claim is made or a suit is commenced against the insured, it should, the contract provides, immediately forward to Zurich all processes received.[13]
 
 
 52
 It is true that the Government failed to notify Zurich of the accident or claim until the last few days in August or the first few days in September 1961. It is undisputed, however, that on April 4, 1961, a few days after the accident, Zurich was apprised through its agents of the fatal accident.[14]
 
 
 53
 The failure to give written notice as soon as practicable, should bar the Government from seeking indemnity on the policy, in the circumstances of this case, only if the insurer Zurich suffered prejudice thereby. As stated in McClellan et ux. v. Madonti et al.[15] by the Pennsylvania Supreme Court:
 
 
 54
 "If the insurer is not harmed, it will not be allowed to complain that notice was not given it in the precise manner specified in the policy."[16]
 
 
 55
 The same individual contract of insurance covered both City Service and the Government (No. 81-18-992). The United States was simply listed as an additional insured. When Zurich received City Service's letter advising of the accident, it is reasonable to infer that Zurich knew, or should have known, that the policy also listed the Government as a beneficiary.
 
 
 56
 This letter did not impose a burden which, as contended in Zurich's brief, "would require the insurer to check every policy and investigate every report to determine if one of their insureds was involved." All that the insurer had to do, to know of the Government's connection, was to look at the policy of insurance, pursuant to which City Service had given notice.
 
 
 57
 In view of the timeliness of City Service's letter notifying the agents of Zurich of the accident, the District Court found that the Government's failure to give reasonable notice was not prejudicial to Zurich and it was liable to the Government by virtue of the insurance contract. The conclusion of the District Court was sound.
 
 
 58
 Since the points raised by the appellants United States and Zurich Insurance Company have been found to lack merit,[17] the judgment of the United States District Court for the Western District of Pennsylvania, as embodied in its order of January 24, 1963, will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 28 U.S.C. § 1346(b) (1958)
 
 
 [2]
 See 12 Purdon's Pa.Statutes Ann. §§ 1601-1604 (1953)
 
 
 [3]
 See 20 Purdon's Pa.Statutes Ann. §§ 320.601, 320.603 (1950)
 
 
 [4]
 The window cleaning contract provided:
 "INSURANCE
 "The contractor agrees that during the term of this contract, the contractor will procure and maintain at its own expense, such insurance as is required by the Government, as well as insurance against such other hazards and casualties as the contractor may require. The insurance required shall be carried in such manner, and with such companies as may be approved by the Government."
 
 
 [5]
 43 Purdon's Pa.Statutes Ann. § 25-1 to § 25-15 (1952)
 § 25-2 proclaims:
 "§ 25-2. General safety and health requirements
 "(a) All establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein.
 * * * * *
 "(g) All building construction, demolition, and cleaning, including window cleaning, shall be conducted in a manner as to avoid accident hazards to workers or the public. Scaffolds, ladders, material hoists, window cleaning devices, safety belts, and other equipment used in such operations, shall be designed, manufactured, constructed, and erected as to be safe for the purpose intended. All stairs, open-sided floors, platforms, and runways shall be provided with proper railings and toeboards."
 
 
 [6]
 The letter is as follows:
 "An accident occurred at the Victory Building, Liberty and 9th Street, on March 25th, that resulted in the fatality to our employee, Boyd L. Wiseman. There was no injury to any individual or property to our knowledge. This is just to inform you of this accident."
 
 
 [7]
 The reply is as follows:
 "We thank you for your letter of March 30 advising us of the unfortunate accidental death of Boyd L. Wiseman. We are notifying the Zurich Insurance Company of this incident as a matter of record only."
 
 
 [8]
 The policy states:
 "10. NOTICE OF ACCIDENT. When an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses."
 "11. NOTICE OF CLAIM OR SUIT. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."
 
 
 [9]
 Jackson et al. v. United States, 196 F.2d 725, 726 (3 Cir. 1952)
 
 
 [10]
 Giannone v. United States Steel Corp., 238 F.2d 544, 546 (3 Cir. 1952)
 
 
 [11]
 Grace v. Henry Disston & Sons, Inc., 369 Pa. 265, at 268-269 and 272-273, 85 A.2d 118, at 119-120, and 121 (1952); Cooper v. Heintz Manufacturing Company, 385 Pa. 296 at 302-305, 122 A.2d 699, at 702-704 (1956)
 
 
 [12]
 For the germane provision of the policy, supra note 8
 
 
 [13]
 Ibid
 
 
 [14]
 For the contents of City Service's letter to the agents of Zurich, supra note 6, and for the reply, supra note 7
 
 
 [15]
 313 Pa. 515, 169 A. 760 (1933)
 
 
 [16]
 Ibid; Morris et al. v. Bender, 317 Pa. 533 at 538, 177 A. 776, at 778 (1935), cites this quotation with approval
 
 
 [17]
 The record reveals that for the purpose of appeal no foundation was laid in the District Court concerning the nature and amount of workmen's compensation paid or owed to the appellee, and the way in which this might have been reflected in the damages awarded in the order for judgment. Nor are such issues raised on appeal. See Dowhy v. Harvey B. Moyer, Inc. v. Eastern Engineering Co., 184 F. Supp. 31 (E.D.Pa.), aff'd, 278 F.2d 753 (3 Cir. 1960). See also J. W. Brown Jr. Equipment Rental Corporation v. Dickey, 397 Pa. 454, 459-60, 462, 155 A.2d 836, (1959); Justice v. United States, 208 F. Supp. 724, 726-28 (W.D.Pa.1962); Quiones v. Township of Upper Moreland v. McCabe, 199 F.Supp. 758 (E.D.Pa. 1961) ; Migias v. United States, 167 F. Supp. 482, 488 (W.D.Pa.1958) ; and Annot. Workmen's Compensation-Contribution, 53 A.L.R.2d 977, 984-85 (1957)