448 A.2d 1

**Mary Catherine OSWALD, Appellant,**

v.

**Arthur STEWART and Arlene Stewart**

v.

**Raymond C. FLORENCE t/d/b/a Florence Real Estate.**

Superior Court of Pennsylvania.

Argued Nov. 13, 1980.

Filed May 14, 1982.

Reargument Denied Aug. 6, 1982.

Arnold M. Friedman, Pittsburgh, for appellant.

Warren D. Ferry, Pittsburgh, for appellees.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal from an order denying a motion for new trial. Appellant seeks to recover for personal injuries incurred in a fall through a basement door on property owned by appellee. She argues, among other matters, that the lower court erred in charging the jury on the "choice of paths" doctrine. We agree, and therefore reverse and remand for new trial.

Appellant is a real estate agent, and appellee's property was the first she had ever listed for sale. On January 7,

1974, appellant visited appellee's property for the second time. Another real estate agent, Richard Fassinger, who was her senior and had been to the property several times before, was with her. Since they could not enter the property through the front door, appellant and Mr. Fassinger walked around the side of the house to the back porch. There they were confronted by two gates, side-by-side, which barred their access to the back porch and the back door.

The gate to the left was an accordian gate, about twenty inches high, which was opened and closed by means of a mechanical latch. The gate to the right was a chicken wire gate, about three feet high, which was fastened in two places by wiring. Mr. Fassinger opened the accordian gate and proceeded through it, stepping over a wooden basement door that was flush with the cement floor of the back porch area. Appellant followed him through the gate, but stepped on the basement door. The basement door gave way, and appellant tumbled through it for about six feet into the basement below.

The lower court charged the jury, in pertinent part, as follows:

Now in this case one of the points that counsel has stressed and you have listened to this argument concerns what we call the alternate safe course rule. I am reading now to you from Feldman's book, Pennsylvania Trial Guide, and in section 30.19 he lucidly states, "Where a person has a choice of two ways, one of which is perfectly safe and the other of which is subject to risks and dangers, and the person voluntarily chooses the course of risks and dangers, he is guilty of contributory negligence and may not recover." However, there is no law which requires anybody to follow a particular course, and even if an alternative course could be determined to be hypothetically safer that the one still—but the one chosen is still free of hazard, he is not contributorily negligent merely because he could have taken an alternative route. Basically he concludes the question is whether the path chosen was

an obviously dangerous one and whether a reasonably prudent person would not have followed the path chosen by the plaintiff. So that if you find that the one path leading from the alleyway between the two houses to the back yard, shall we say, or to the area near that stairway which connected the upper porch with the level of the land in the back yard, if you find that the one course of travel involved an obvious hazard, that is, through what has been referred to here as the accordian gate connecting the rear of the house with the post supporting the porch in the rear, if you find that that was hazardous and that the other way was alternatively available, and that has been called the chicken wire gate, fence, if you find that that was a known danger and that an alternative course should have been taken, you could determine that the plaintiff was contributorily negligent. However, if you find that was not an obvious danger, the door we are talking about, and was not a known hazard, then, of course, the rule wouldn't apply.

N.T. 408a–410a.

Appellant argues that this charge was error because "no evidence was presented in this case that the door constituted an obvious danger which the appellant was aware of or should have been made aware of." Appellant's Brief at 10. We agree.

At the outset, it is important to point out that the choice of ways—or choice of paths—doctrine has a narrow scope of application. Many cases refuse to apply the doctrine, and suggest that it is to be applied in only the clearest case. *See, e.g., Tonik v. Apex Garages, Inc.,* 442 Pa. 373, 275 A.2d 296 (1971); *Quinn v. Kumar,* 437 Pa. 268, 263 A.2d 458 (1970); *Hopton v. Donora Borough,* 415 Pa. 173, 202 A.2d 814 (1964); *Cooper v. Heintz Manufacturing Co.,* 385 Pa. 296, 122 A.2d 699 (1956); *Downing v. Shaffer,* 246 Pa.Superior Ct. 512, 371 A.2d 953 (1977); *Eller v. Work,* 233 Pa.Superior Ct. 186, 336 A.2d 645 (1975) (suggesting doctrine not applicable without reaching question); *Miller v. Miller,* 224 Pa.Superior Ct. 569, 308 A.2d 115 (1973); *Garvin v. Pittsburgh,* 161

Pa.Superior Ct. 140, 53 A.2d 906 (1947); *Graham v. Reynoldsville Borough*, 132 Pa.Superior Ct. 296, 200 A. 681 (1938). Indeed, we have been able to find only two modern cases applying the choice of paths doctrine, and they demonstrate how obvious must be the risk of the path chosen. In *DeFonde v. Keystone Valley Coal Co.*, 386 Pa. 433, 126 A.2d 439 (1956), the decedent could have walked around the front end of a bulldozer to reach his truck but instead, he "darted forward between the rear of the [mechanical] shovel and the bulldozer and was there caught and crushed between the two vehicles due to the recoil of the shovel over the three or four foot gap which separated it from the bulldozer." *Id.*, 386 Pa. 436, 126 A.2d at 440. The Supreme Court held that the decedent's choice to "duck", *id.*, between the two machines rather than walk around them was an "obviously dangerous one." *Id.*, 386 Pa. 434, 126 A.2d at 440. Similarly, in *Tharp v. Pennsylvania Railroad Co.*, 332 Pa. 233, 2 A.2d 695 (1938), the decedent did not use a bridge over the railroad tracks but chose to cross over a set of four railroad tracks, and was struck by an oncoming train in the second track.

In contrast to both *DeFonde* and *Tharp*, the danger of the path appellant chose—through the accordian gate and over the cellar door rather than through the chicken wire gate—was not at all obvious. Appellant testified that the cellar door "seemed to be okay to walk on." N.T. 36a. Mr. Fassinger, the realtor who accompanied appellant in her visit to the house, and who proceeded through the accordian gate before appellant, testified that the door "did not look dangerous," and that he knew it was dangerous, and therefore stepped over it, only because he had examined the door on earlier visits to the house:

Q. Describe how the door appeared as it was before you stepped across.

A. Well, the door did not look dangerous.

Q. Tell us what you mean about how it looked first.

A. There was a tongue-grooved very old door, say it would be close to forty years old.

Q. Did it look or did it not look dangerous?

A. To someone walking across the first time, it would not appear dangerous.

MR. FERRY:

Object to that since he has been there before.

THE COURT: Sustained.

Q. Describe without using the word whether it is dangerous or not, describe the appearance of the door as closed when you walked over it as best you can. What type of door was it?

A. It was a trap door similar to the one in that photostat.

Q. Was it flush?

A. Yes. It was part of the walking area.

Q. Was it solid or did it appear broken?

A. Well, there was some rotted areas along the frame at the hinge area.

Q. Did it appear solid, the door?

A. At that time, no. The first time I walked across it, yes.

Q. When had you walked across it?

A. On my first showing of the property.

Q. How long before was that?

A. Two months.

Q. You had walked over it two months before?

A. Yes.

Q. Did you know yourself whether this door was dangerous?

A. Yes, I did.

MR. FERRY: Objection.

THE COURT: Sustained again.

Q. Did you ever open this door on previous occasions?

A. Yes.

Q. Did you learn anything about the condition of the door from your previous visits?

A. From opening it, I found that the hinge gave way at the frame.

Q. When had you opened it?

A. On my first showing of the property approximately two months before the accident.

Q. Explain what you mean the hinge gave way when you opened it.

A. Well, when you pick up a door, you are picking it up from the bottom and the bottom hinge was completely—or I shouldn't say completely—but the bottom hinge was rotten out so that when you—and you are trying to pick it up to turn it. You either pick it up—the door was like not attached. It was a very heavy door.

Q. Did you tell Mary anything about this door at any time before she stepped on it?

A. No.

Q. When you stepped across the door, did you tell her before she stepped across it, did you tell her anything about what it was like when you opened the door?

A. No.

In addition, the owner of the property and one of the appellees in this case, Mr. Steward, testified that the door was "in good condition" at the time of the accident and that he did not know of anything about the door that would indicate that it was unsafe to walk upon. N.T. 308a–309a. Mrs. McAdoo, a broker for appellee real estate agency, testified only that the door looked "weather-beaten"—not that it looked unsafe. N.T. 243a.

Moreover, the fact that Mr. Fassinger walked ahead of appellant, through the gate and over the door, without injury, cuts against an argument that the route that both took was dangerous. Appellant testified that she did not see Fassinger step over the door, because "he was directly in front of me." N.T. 96a. So far as appellant knew, the route over the door was a safe one, as Fassinger had taken it without incident. *See Quinn v. Kumar, supra* (plaintiff did not appreciate danger to path taken where he had taken same route without mishap immediately before accident).

We are therefore satisfied that the jury should not have been charged on the choice of paths doctrine. There is, however, another aspect of this case, which appears to have

been overlooked by the lower court. The lower court, in its charge to the jury, stated that it was reading from Feldman, *Pennsylvania Trial Guide* § 30.19. N.T. 408a. However, a review of the charge reveals that the court failed to consider the second paragraph of Feldman's discussion. This failure is significant, for when the second paragraph is considered, it is evident that the choice of paths doctrine does not apply here.

The entire § 30.19 reads as follows:

It has been stated as a general proposition that where a person has a choice of two ways, one of which is perfectly safe and the other of which is subject to risks and dangers, and the person voluntarily chooses the latter and is injured, he is guilty of contributory negligence and cannot recover. However, there is no law which requires anybody to follow any particular course in reaching his destination, and even if an alternative course could be determined to be hypothetically safer, but the one chosen is still free of hazard, a person is not contributorily negligent merely because he could have escaped injury by taking the alternate route. And the "choice of paths" rule applies only if two distinct ways exist, one of which is clearly recognizable as safe and the other as involving danger, and if the plaintiff has freedom to choose between them. Basically the question is whether the path chosen was an obviously dangerous one, and whether a reasonably prudent person would not have followed the path chosen by the plaintiff.

In determining whether a person is contributorily negligent for having chosen a particular route, it is of significance whether there was some compelling reason for choosing that route. Thus, if the plaintiff is in the course of his employment and is acting under instructions from his superior and the route chosen is more convenient and expeditious, these factors weigh against his choice being considered contributory negligence. And where a workman in the discharge of his duties proceeds from a place where it is necessary for him to be, to another place where

it is necessary for him to go, the law will not proclaim him guilty of contributory negligence if he moves over a route unknown to him, in the exercise of his normal faculties, to be dangerous. And where the route not chosen has dangers which the plaintiff was seeking to avoid, this weighs against contributory negligence.

Feldman, *Pennsylvania Trial Guide* § 30.19 (1978) (footnotes omitted).

The second paragraph of this statement makes plain that the reason appellant chose the route over the door is important to the decision whether the choice of paths doctrine applies. This is so because, as we have said:

The rule requiring a person to select a safe route in favor of a dangerous route is nothing more than a formulation of the general rule that a person is contributorily negligent if his conduct falls short of the standard to which a reasonable person should conform in order to protect himself from harm.

*Downing v. Shaffer*, 246 Pa.Superior Ct. 512, 518, 371 A.2d 953, 956 (1977).

The record shows that appellant's reason for choosing the route over the door was entirely sensible, and did not fall short of the standard to which a reasonable person should conform. Mr. Fassinger testified that the accordian gate was easier to unhook and pass through than the chicken-wire gate:

Q. Indicating an alley on the side. This is the area?

A. Right. We had a choice to go across the accordion [*sic*] door with the latch on it between the post and the building, or to go through the chicken wire fence which was much more detailed as to opening it.

Q. Explain what you mean by this chicken wire fence.

A. It was a mesh type fence and it had some wires connected. It locked onto the post. It was about waist high. And to unsecure that fence would have been much more trouble than to go through the accordion [*sic*] gate with the latch on it.

Q. How would it have been more trouble? How do you recollect it was connected?

A. Well, there was not one wire hooking it onto the post. There were multiple wires hooking it onto the post.

Q. Did you go through the accordion [*sic*] gate?

A. Yes.

Q. How was that latched?

A. With a—like a squeeze type latch that you see on a children's gate.

Q. Did that appear to be something to open?

A. That was simple to open.

Q. Did you go through first, or did Mary?

A. I went through first.

N.T. 116a–117a.

On cross-examination, Mr. Fassinger testified:

Q. You didn't make any attempt to actually open it. You just looked at it and you decided to go through the accordion [*sic*] gate instead of going through that one, is that right?

A. My decision was going through the accordion [*sic*] gate would be easier than to undo the mess that was called a chicken wire gate.

Q. Isn't it correct you actually told Miss Oswald to go through the accordion [*sic*] gate was easier?

A. Yes.

N.T. 147a.

This testimony was corroborated by the testimony of Mr. Sorice, who installed both the accordian gate and the chicken wire fence, and who described how they were fastened, N.T. 268a, 271a, and by appellant, who testified that the accordian gate was "a children's gate that you would use to keep them out of the kitchen," N.T. 33a, and that "there was no obstruction" to opening the gate, N.T. 106a.

It is therefore clear that appellant was in the very situation described in the second paragraph of § 30.19: she was acting in the course of her employment; she was following

the instructions of her superior, Mr. Fassinger; and the route chosen was more convenient and expeditious. The choice of paths doctrine was not applicable in her situation, *Quinn v. Kumar, supra,* and it was error to charge the jury on the doctrine, *Downing v. Shaffer, supra.*

The judgment is reversed and the case remanded for a new trial.