Dargie v. Hillsborough County          CV-93-391-SD   02/23/95
                UNITED STATES DISTRICT COURT FOR THE

                    DISTRICT OF NEW HAMPSHIRE


Richard Dargie

     v.                                    Civil No. 93-391-SD

The County of Hillsborough, et al


                         O R D E R


     Plaintiff Richard Dargie brings this civil rights action

pursuant to 42 U.S.C. § 1983 against the County of Hillsborough

(New Hampshire) and various individually named defendants

associated with the Hillsborough County Department of Corrections

(HCDOC).  Dargie alleges, inter alia, that while he was a

pretrial detainee at the Hillsborough County Jail, defendant

Barbara Condon intentionally and/or recklessly caused him to

suffer emotional distress (Counts VII and VIII).

     Presently before the court is defendant Condon's second

motion for summary judgment,[1] to which the other named defendants

consent, but Dargie objects.
_____

     [1]Condon's previous motion sought summary judgment on
Dargie's federal claims and urged the court, should the motion be
granted, to decline jurisdiction over the state-law tort claims.
The court denied said motion in its entirety on April 28, 1994,
specifically noting that the state-law claims survived summary
judgment because "the court has not dismissed all of plaintiff's
federal claims . . . ."  Order of April 28, 1994, at 6.

## Background

During late 1991 and early 1992, plaintiff Richard Dargie was held as a pretrial detainee in the Hillsborough County Jail awaiting resolution of certain charges pending against him in Hillsborough County Superior Court. Complaint ¶ 18. At all times relevant, defendant Barbara Condon served as the Correctional Health Care Administrator at the jail. As such, she is charged with overseeing the medical department and supervising the nursing staff. Affidavit of Barbara Condon ¶¶ I-II (attached to Defendant's Motion for Summary Judgment).

Although plaintiff was originally housed in the medical unit,[2] he was transferred to the Restricted Housing Unit (RHU)[3] in Pod 2-B[4] in early March 1992 due to several alleged, though

---

[2]Plaintiff, whose left leg was amputated when he was a child, remains ambulatory through the use of a prosthesis or crutches.

[3]Inmates are placed in the RHU "for punitive segregation, because [they have] been found guilty of violating one of the [Jail's] rules . . . and [they are] allowed very little in [their] cell[s] . . . [namely] their legal papers . . . three letters . . . [and] a limited amount of hygiene products . . . ." Deposition of Arthur Bedard at 14, 16-17 (attached to Defendant's Motion for Summary Judgment). "[They are] also locked up twenty three hours a day and . . . get one hour to come out." Id. at 14.

[4]Pod 2-B also houses the Jail's maximum security wing. Bedard Deposition at 14. Contrasted to the RHU, "[o]n the maximum security side, you're allowed more in your cell and you come out two hours a day, plus meals." Id. at 14-15.

presently immaterial, disciplinary infractions. Id. ¶ IX. While housed in the RHU, plaintiff's prosthesis irredeemably deteriorated,[5] thus reducing his available means of self-locomotion to either hopping, crawling, or using crutches. Complaint ¶¶ 25, 28.

Dargie alleges that some time after his prosthesis broke, yet on the same day, he sprained his right ankle while hopping around his cell. Id. ¶ 30. A member of the nursing staff rendered assistance, prescribing strict bed rest for twenty-four hours. Condon Affidavit ¶ IV. Although plaintiff requested crutches at the time, said request was denied because he "needed to stay off his ankle to treat the sprain." Id. ¶ V.

When Condon examined Dargie the following morning, she found no evidence of swelling, but decided that due to Dargie's present limitations he should be reassigned from his second-floor cell to one on the first floor. Id. ¶¶ VI-VII. To accomplish said transfer, Condon "decided that while [Dargie] could use crutches to get to the stairs, it was not safe for him to use crutches to descend the grated stairs as he was claiming to have a sprained ankle." Id. ¶ VII. Condon thereupon suggested "that the safest method for Mr. Dargie to descend the stairs was for him to sit

---

[5]Although the parties dispute whether this deterioration was due to normal wear and tear or at Dargie's own hand, such a factual inquiry is not material to the matter presently at bar.

3

down and ease himself down step by step with assistance from me and a Corrections Officer who was also present." Id. Although Dargie refused to descend the stairs as initially suggested, id. ¶ VIII, he ultimately agreed to let some correctional officers carry him down the stairs, Affidavit of Richard R. Dargie ¶ 11 (attached to Plaintiff's March 31, 1994, Objection to Condon's First Motion for Summary Judgment).

Despite the RHU policy prohibitions, Dargie made repeated requests for constant access to crutches.[6] Bedard Deposition at 16-17. Arthur Bedard, Chief of Security at the Jail, decided, after consultation with Condon, that Dargie was not to have crutches in his cell because there "was no medical need and the crutches could have been used as a weapon." Id. at 25.

On March 16, 1992, Dargie twice attempted to commit suicide in his cell, and Condon examined him after each attempt. Subsequent to the first attempt, Condon placed Dargie on "constant watch," as dictated by medical department procedure.[7] Condon Affidavit ¶ XIII. Once an inmate is designated a

---

[6]Although crutches are encompassed by said prohibition, an exception exists for circumstances of medical necessity. Bedard Deposition at 24-25; Condon Affidavit ¶ X.

[7]Three watch levels are employed by the HCDOC staff: fifteen-minute regular watch; fifteen-minute special watch; and constant watch. Bedard Deposition at 6. On constant watch, "an officer [sits] right in front of the cell watching the inmate." Id. at 7.

4

"constant watch," all nonmedical monitoring responsibility is assumed by the correctional staff.  Id. ¶ XIV; Bedard Deposition at 45.

Approximately one month after the suicide attempts, Dargie was transferred from the RHU to maximum security.  Bedard Deposition at 46.  The medical department, the shift commanders, and Captain Bedard thereupon determined that, since the maximum security wing was a different classification than the RHU, Dargie would be provided with crutches in the new facility.  Id.  Thus, on or about April 23, 1992, fifty-two days since he lost the use of his prosthesis, Dargie obtained continual access to a pair of crutches.


## Discussion

### 1.  Summary Judgment Standard

Summary judgment shall be ordered when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Stone & Michaud Ins., Inc. v. Bank Five for Savings,

5

785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  Although "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal," Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994), the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor, Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994); see also Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994); Maldonado-Denis, supra, 23 F.3d at 581.

The respective roles of the movant and the nonmovant in summary judgment practice are precisely choreographed.  "The movant must put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'  The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Maldonado-Denis, supra, 23 F.3d at 581 (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citing and quoting, inter alia, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (other citations omitted))).

> When a party fails to make a showing
> sufficient to establish the existence of an

6

> element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.

Smith, supra, 40 F.3d at 12 (citing Celotex, supra, 477 U.S. at 322-23; Woods, supra, 30 F.3d at 259).

Summary judgment, though austere in its result, is no less appropriate "'in cases where elusive concepts such as motive or intent are at issue . . . [should] the nonmoving party rest[] merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" National Amusements, Inc. v. Dedham, No. 94-1176, ___ F.3d ___, ___, 1995 WL 636, at *12 (1st Cir. Jan. 4, 1995) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

2. Emotional Distress

New Hampshire recognizes the tort of intentional or reckless infliction of emotional distress. See Morancy v. Morancy, 134 N.H. 493, 495, 593 A.2d 1158, 1159 (1991). Under New Hampshire law, "'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to

7

the other results from it, for such bodily harm.'" Id., 134 N.H. at 496, 593 A.2d at 1159 (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)).[8]  Thus, in order to sustain his emotional distress claim against defendant Condon, Dargie must demonstrate that (1) she acted intentionally or recklessly, (2) her behavior was "extreme and outrageous," and (3) his emotional distress was severe.[9]

### a.  Intentional Conduct

"The rule stated in Section [46] applies where the actor desires to inflict severe emotional distress, and also where [she] knows that such distress is certain, or substantially certain, to result from [her] conduct." RESTATEMENT, supra, § 46 cmt. i.

---

[8]Implicit in the formulation of this rule is, as in most tort concepts, the issue of causation.  That is, in order to successfully advance a claim for emotional distress, a plaintiff must establish a nexus between the defendant's conduct and the resultant emotional distress.  See infra subpart d (discussing causation element of "severe emotional distress"); see also Agis v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976) (same).

[9]In pressing his claim, Dargie asserts that he suffered severe emotional distress "as the result of the entire course of conduct that he was subjected to," Objection to Defendant Condon's Motion at 7, reaching such a degree of severity "that he attempted to commit suicide," id. at 8.  Although Dargie asks the court to consider, in evaluating his emotional distress claim, the entire 52-day period when he was without constant access to crutches, the court finds that the appropriate period of review is the 14-day span between March 2, 1992, when Dargie lost the use of his prosthesis, and March 16, 1992, when Dargie twice attempted to commit suicide.

8

At his deposition, Dargie testified as follows concerning his treatment while in the RHU and the alleged resultant emotional distress:

> Q. Now, you also allege in your complaint that you suffered emotional harm as a consequence of being deprived of your crutches for the 53 [sic] day period.
> A. That's correct.
> Q. Will you describe the nature of he emotional injury or harm that you suffered?
> A. Well, it was like almost unbelievable. I couldn't see any reason why they would deny my crutches. It was just sheer punishment on their part. I did nothing to warrant it and day after day after day after asking them and just flat being denied, I couldn't understand it, you know, it was puzzling. I felt like I was in a communist country for a while there. I had never been through that before in my life. Taking my crutches away for no reason, making me crawl around on my hands and knees, it was almost unbearable. It got that bad.
> Q. You described why you were upset about having your crutches removed. The question was what type of emotional harm did you sustain? Can you respond to that question?
> A. I believe I just did, but I will respond again. Like I said, it was unbelievable. You know, I just couldn't understand why they were doing this. It was stressing me out. Nobody ever put me in that predicament before. There was no need for it. It was very unreasonable and after inquiring as to why and not receiving any answers, just flat out being denied the use of my crutches, it was very stressful and very emotional.
> . . . .
> Q. And in your opinion that constitutes emotional harm, correct?
> A. Yes.
> Q. What physical manifestations of the emotional harm did you experience?

9

A.  Well, after two weeks of being in that predicament and steadily requesting my crutches and steadily being denied them, I attempted suicide as a result.

Q.  Were there any other physical manifestations of the emotional harm that you suffered?

A.  The emotional harm?

Q.  Correct.

A.  I don't believe so.

Deposition of Richard Dargie (attached to Defendant's Motion) at 39-42 (emphasis added).

With specific reference to the alleged actions of defendant Condon, Dargie testified as follows:

Q.  So Barbara Condon visited you, she checked the ankle and then explained you were going to be moved?

A.  Yes, she came to my cell with my crutches and said I was going to be moved to the bottom tier.

Q.  And then what happened?

A.  I don't know why she bothered coming to my door with my crutches because then she wouldn't let me use them.  She told me I had to slide down the stairs on my buttocks.

.  .  .  .

Q.  Did you suffer emotional harm as a result of Barbara Condon suggesting you slide down the stairs on your buttocks?

A.  To a point I would say I did, yeah.  It was pretty humiliating.  She was more or less just teasing me, her and the sergeant thought it was kind of a joke, you know, coming to my cell with my crutches but telling me I couldn't use them.

.  .  .  .

Q.  What physical symptoms, if any, did you suffer as a result of the humiliation?  You said you experienced humiliation from Barbara Condon's suggestion that you slide down the stairs.

10

```
          A.  What physical symptoms?
          Q.  Yes.
          A.  I don't believe I had any physical
     symptoms.
```

Dargie Deposition at 78, 80, 81 (emphasis added).

According to Dargie, therefore, two specific areas of Condon's conduct caused his emotional distress and resultant suicide attempts: her failure to accommodate his requests for constant access to crutches and her suggested means of moving Dargie from the second to the first floor.[10]

Countering these allegations, Condon asserts that

> VI.  [On] . . . March 3, 1992, I went to Mr. Dargie's cell around 9:00 a.m. and examined his ankle.  I found no swelling.
> VII.  Nevertheless, because Mr. Dargie had complained about his ankle and had been grimacing while I examined it, I decided that, for his safety and convenience, he should be moved from the second floor, where his cell was located, to a cell on the first floor, which is where the shower facilities are located.  I also decided that while he could use crutches to get to the stairs, it was not safe for him to use crutches to descend the grated stairs as he was claiming to have a sprained ankle.  I determined that the safest method for Mr. Dargie to descend the stairs was for  him to sit down and ease himself down step by step with assistance from me and a Corrections Officer who was also present.  I explained this to Mr. Dargie and I also offered to obtain a blanket to

---

[10]As more fully addressed in subpart c, _infra_, such incidents are more probative, if at all, of whether Condon's conduct was "outrageous" rather than whether said actions were intentionally taken so as to cause Dargie emotional distress.

11

cushion his buttocks.

VIII. Mr. Dargie refused to descend the steps in the manner I suggested.

IX. . . . While Dargie was housed in the RHU, neither I nor any member of my staff could have granted a request by Dargie for crutches while in his cell because the HCDOC's policy prohibited crutches in RHU cells as a security precaution.

X. At most, I could have opined that Dargie needed crutches for a medical reason. I did not for two reasons. First, Dargie's cell in the RHU was so narrow that crutches were not medically necessary as the average amputee could easily "trans-pivot" the three foot distance from the bunk to the toilet or desk. Second, Dargie is more robust and active than the average amputee. For example, he played basketball while held at the HCDOC.

XI. Inmates in the RHU are allowed crutches while outside their cells. Accordingly, the following day, I brought crutches to Dargie's cell, and adjusted them so Dargie could use them safely and comfortably when he was allowed outside his cell.

XII. After March 4, 1992, neither I nor my staff ever received a request from Mr. Dargie for crutches.

Condon Affidavit ¶¶ VI-XII. Rather than specifically oppose such testimony, Dargie merely asserts that "Condon's sworn denials of any improper motive are not dispositive because such an improper motive can reasonably be inferred from the facts." Objection at 7 (citation omitted).[11]

---

[11]In support of his claim that the court should decline to make motive determinations at the summary judgment stage, Dargie cites Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464 (1962); Conrad v. Delta Air Lines, Inc., 494 F.2d 914 (7th Cir.

Dargie's unsupported speculation about whether the jury will find Condon's testimony to be credible is insufficient to satisfy the present burden. The court, therefore, finds and rules that plaintiff's intentional infliction of emotional distress claim (Count VII), as it relates to defendant Condon, is insufficient as a matter of law. Accordingly, defendant Condon's motion for summary judgment with respect to said claim must be and herewith is granted.

### b. Reckless Conduct

Plaintiff likewise maintains an alternative claim of severe emotional distress predicated upon alleged reckless conduct on the part of defendant Condon.

---

1974); and <u>Schoenbaum v. Firstbrook</u>, 405 F.2d 215 (2d Cir. 1968), <u>cert. denied sub nom.</u>, <u>Manley v. Schoenbaum</u>, 395 U.S. 906 (1969). The court notes, in the first instance, that none of the cited cases pertain to the intentional or reckless infliction of severe mental distress. Moreover, to the extent that <u>Poller</u> stands for the proposition that motive and intent determinations are better suited for a jury, such dicta has been criticized by many courts, including the Supreme Court. <u>See</u>, <u>e.g.</u>, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986). Finally, the First Circuit has recently indicated "that a <u>bare assertion</u> that the opposing party's uncontroverted evidence might be disbelieved is insufficient to resist judgment as a matter of law on an issue as to which the party resisting judgment bears the burden of proof." <u>Favorito v. Pannell</u>, 27 F.3d 716, 721 (1st Cir. 1994). "Were it otherwise," the court concluded, "Rules 50 and 56 could be rendered virtually useless, merely on the strength of a nonmovant's supposition that the movant's uncontroverted evidence might be disbelieved." <u>Id.</u>

The emotional distress rule as formulated in section 46 of the RESTATEMENT, supra, "applies also where one acts recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow."  RESTATEMENT, supra, § 46; see also Murdock v. City of Keene, 137 N.H. 70, 73, 623 A.2d 755, 757 (1993) (conduct is reckless "when the jailer knows that a prisoner is likely to attempt suicide, or has knowledge of facts that would lead a reasonable person to so believe, and fails to take reasonable measures to prevent such an attempt").

The court finds the evidence before it to present a close call as it relates to the issue of Condon's alleged reckless behavior.  Despite such reservations, the court further finds that such evidence, when construed in the light most favorable to the plaintiff, is sufficient to support a finding that defendant Condon acted recklessly under the circumstances.

### c.  Outrageous Conduct

The second prong of a successful emotional distress claim requires a showing that defendant's conduct was, at a minimum, "extreme and outrageous."  See RESTATEMENT, supra, § 46 cmt. d. Importantly, liability has been imposed

> only where the conduct has been so outrageous
> in character, and so extreme in degree, as to

14

> go beyond all possible bounds of decency, and
> to be regarded as atrocious, and utterly
> intolerable in a civilized community.
> Generally, the case is one in which the
> recitation of the facts to an average member
> of the community would arouse his resentment
> against the actor, and lead him to exclaim,
> "Outrageous!"

Id. As a matter of New Hampshire law, therefore, when a defendant's conduct fails to rise to the level of "outrageous conduct" as defined in the RESTATEMENT, emotional distress claims based thereon are insufficient to create liability. See e.g., Jarvis v. Prudential Ins. Co., 122 N.H. 648, 652, 448 A.2d 407, 409 (1982); Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1188-89 (D.N.H. 1992).

Although the question of whether a defendant's conduct has been sufficiently extreme and outrageous to result in liability is subject to determination by a jury, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." RESTATEMENT, supra §46 cmt. h. In making the "extreme and outrageous" determination, the court is mindful that such conduct "should not be considered in a 'sterile setting detached from the surroundings in which it occurred . . . .'" Godfrey, supra, 794 F. Supp. at 1189 (quoting Wethersby v. Kentucky Chicken Co., 587

15

A.2d 569, 578 (Md. 1991)).  Whether the alleged tortfeasor abused a position of actual or apparent authority over the injured party weighs heavily in characterizing conduct as "extreme and outrageous."  See id. at 1190; see also W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 12, at 61 (5th ed. 1984) ("The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff's interests); RESTATEMENT, supra, § 46 cmt. e.

In her capacity as Correctional Health Care Administrator, defendant Condon exercised supervisory authority over the jail's medical department and nursing staff.  It is foreseeable that an inmate in need of medical care, whether due to an existing handicap or a current illness, could perceive defendant's position to be one of "actual or apparent authority" over his interests.

In particular, plaintiff alleges that while Condon was acting as the Jail's nurse supervisor she:

> (i) Attempted to publicly humiliate Dargie by ordering him "to slide down the stairs on (his) ass;"
> (ii) Teased and taunted Dargie regarding the use of his crutches;
> (iii) Ignored Dargie's repeated requests

16

that he be provided with some means of self-
　　　locomotion while he was locked in his cell;
　　　　(iv) Took no action to see that Dargie was
　　　provided with clothing and bedding prior to
　　　his attempted suicide; and,
　　　　(v) Took no action to see that Dargie was
　　　provided with clothing and bedding following
　　　his attempted suicide.

Objection at 4.  In the view of the court, this alleged abuse of
Condon's position of authority could provide a basis for finding
her conduct to be extreme and outrageous.  As such, the court
finds plaintiff has raised a genuine issue with regard to the
"outrageous" prong of the emotional distress calculus.


　　　d.　Severe Emotional Distress

　　　Despite sufficiently raising genuine issues pertaining to
Condon's alleged "reckless" and "outrageous" conduct, Dargie must
further satisfy his burden regarding "severe emotional distress"
or face *brevis* disposition of the entire claim.  See RESTATEMENT,
supra § 46 cmt. j ("It is only where [the emotional distress] is
extreme that the liability arises.").

　　　In defining "severe emotional distress," the New Hampshire
Supreme Court again looks to the RESTATEMENT for guidance.
Liability for the intentional or reckless infliction of severe
emotional distress

　　　　"applies only where the emotional distress

17

> has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like.  It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. . . .  <u>The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.</u>"

<u>Morancy</u>, <u>supra</u>, 134 N.H. at 496, 593 A.2d 1159 (emphasis added) (quoting RESTATEMENT, <u>supra</u> § 46 cmt. j).

Although the New Hampshire cases do not make the point pellucidly clear, a showing of causation, however, is integral to a successful emotional distress claim and must be so demonstrated before liability will attach.  <u>See</u> RESTATEMENT, <u>supra</u> § 46 cmt. j; <u>see also</u> <u>Mayer v. Town of Hampton</u>, 127 N.H. 81, 87, 497 A.2d 1206, 1211 (1985) ("in order for a cause of action for wrongful death by suicide to lie for intentional torts, the plaintiff must demonstrate that the tortfeasor, by extreme and outrageous conduct, intentionally wronged a victim and that this intentional conduct caused severe emotional distress in his victim which was a substantial factor in bringing about the suicide of the victim"); <u>Caputo v. Boston Edison Co.</u>, 924 F.2d 11, 15 (1st Cir. 1991) ("[i]ntentional infliction of emotional distress cases have also emphasized the causal nexus between defendant's conduct and

18

plaintiff's injury") (applying Massachusetts law). Whereas the New Hampshire Supreme Court has left "for another day the determination whether proof of physical manifestations is a prerequisite for a finding of severe emotional distress," Morancy, supra, 134 N.H. at 496, 593 A.2d at 1160, an emotional distress plaintiff is nonetheless required to establish a connection between the defendant's conduct and their emotional injury, Mayer, supra, 127 N.H. at 87, 497 A.2d at 1211. Proof of such a nexus, or "substantial causation," "will usually be based on expert testimony." Id., 127 N.H. at 87, 497 A.2d at 1211.

In moving for summary judgment, Condon has presented excerpts from Dargie's deposition where he indicates that his emotional distress exhibited itself in the form of humiliation, incredulity, and upset. Dargie Deposition at 39-40, 41, 80. Condon has thus indicated to this court that plaintiff's emotional distress, such as it was, was not "'so severe that no reasonable man could be expected to endure it.'" Morancy, supra, 134 N.H. at 496, 593 A.2d at 1159 (quoting RESTATEMENT, supra § 46 cmt. j).

Opposing said motion, Dargie contends, without more, that Nurse Condon's conduct caused him to suffer severe emotional distress and that such distress directly served to precipitate

19

his two March 16, 1992, suicide attempts.  "Based upon the facts alleged," Dargie submits, "a reasonable juror could find that [I] suffered severe emotional distress."  Objection at 8.

Although the summary judgment standard is susceptible to a certain degree of liberality,

> the nonmovant cannot simply rest on perfervid rhetoric and unsworn allegations.  When, for example, defendants invoke Rule 56 and identify a fatal flaw in a plaintiff's case, <u>it becomes the plaintiff's burden to produce specific facts, in suitable evidentiary form, to contradict the flaw's existence and thereby establish the presence of a trialworthy issue.</u>

<u>Morris v. Government Dev. Bank</u>, 27 F.3d 746, 748 (1st Cir. 1994) (emphasis added) (citation omitted); <u>see also</u> <u>Favorito</u>, <u>supra</u> note 11, 27 F.3d at 721.  Should the plaintiff neglect to or insufficiently sustain said burden, "the court may adjudicate the motion as a matter of law."  <u>Id.</u>

Since "[f]actual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment," <u>Nieves ex rel. Nieves v. University of Puerto Rico</u>, 7 F.3d 270, 276 n.9 (1st Cir. 1993), plaintiff's objection clearly does not operate to sustain his present burden.  However, in ruling on the present

20

motion, the court went well beyond the instant pleadings and reviewed all the papers filed with the court pertaining to the litigation at bar.

Upon review of all the evidence, the court finds that whatever emotional distress plaintiff may have experienced, such distress did not rise to the requisite level of severity. The court further finds that plaintiff failed to establish a nexus between said distress and the March 16, 1992, suicide attempts.[12] In consequence thereof, defendant Condon's motion for summary judgment on the reckless infliction of severe emotional distress claim (Count VIII) must be and herewith is granted.


## Conclusion

For the reasons set forth herein, defendant Condon's motion for summary judgment (document 32) is granted with respect to the

---

[12]The court notes that plaintiff's expert, Dr. John A. Cegalis, Ph.D., has opined that "stripping Mr. Dargie of his clothing and bedding, and depriving him of medically ordered constant monitoring, directly contributed, in my opinion, to his second suicide attempt." Psychological Consultation of John A. Cegalis, Ph.D., at 3 (filed on Aug. 17, 1994, pursuant to an order to compel dated Aug. 5, 1994). Notwithstanding the unsworn character of said statement, it specifically relates to the second suicide attempt and draws a nexus between that attempt and two conditions that were neither under Condon's control nor specified by Dargie as instances of emotional distress. As such, the court finds Dr. Cegalis's statement insufficient to create an issue that is either genuine or material.

21

claims of intentional (Count VII) and reckless (Count VIII) infliction of severe emotional distress.

SO ORDERED.

                                       _____
                                       Shane Devine, Senior Judge
                                       United States District Court

February 23, 1995

cc:   Nicholas K. Holmes, Esq.
       Carolyn M. Kirby, Esq.
       James G. Walker, Esq.
       Robert J. Lanney, Esq.