Cooper *v.* Heintz Manufacturing Company, Appellant.

Argued April 24, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Lynn L. Detweiler,* with him *Swartz, Campbell & Henry,* for appellant.

*S. Walter Foulkrod, Jr.,* with him *John H. Hines, John J. McDevitt, 3rd, Howard R. Detweiler* and *Ambler, Detweiler & Walsh,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 21, 1956:

This case has to do with the mysterious element of electricity which, although invisible to the eye, wields a force capable of illuminating the world, propelling machines of fabulous complexity, transporting incalculable weights, and destroying or crippling life. The defendant Heintz Manufacturing Company employed electricity as motive power in its large plant in Philadelphia, maintaining and operating in this connection six transformers which were installed in a structure attached to the south side of one of its buildings here called Building No. 42. In order to protect workmen and others on the property from the dangerous properties of the transformers, the ominous mechanism was shut off from the rest of the plant by a brick wall on the north side and, on the east, west and south sides, by a heavy metal screening surmounted by a solid corrugated material known as transite. Copper tubes named "bus bars" carried electric current to the tune of 13,200 volts from the transformers to the factory buildings. Uninsulated, these tubes offered catastrophe to human contact. The transformer room, on stilt-like columns, stood 20 feet 4 inches above the ground and measured 25 by 20 feet with a ceiling 14 feet high. The bus bars ran parallel to and 42 inches below the ceiling.

Some time prior to September 28, 1953, the date of the tragic episode which is the subject of this lawsuit, the Heintz Manufacturing Company engaged the Baton Construction Company to erect a building (to be known as Building No. 41) to adjoin and connect with (on the south side) Building No. 42. When completed, Building No. 41 would enclose and engulf the transformer tower. On September 19, 1953, the electricity in the transformer room was turned off in order to permit the attachment of the steel of the new building to the metal skeleton of the old structure. The screen-

ing and transite partition was removed from the south side of the transformer room. During the time the electric current was turned off, the transformer tower was as innocuous as an old tree and the absence of the south wall was a matter of total indifference to mankind. However, it was (or should have been) obvious that when the electric current would have been turned on again, this structure, with one side removed, offered a peril as potential as an occupied tiger's cage with one side missing. An appreciation of the most elementary rules of safety, plus a due regard for the priceless value of human life, should have dictated serious concern for the protection of those workmen who would, in the discharge of their duties, come within striking distance of the cobra-dangerous bus bars.

The transformers were reactivated on September 21, 1953, but the screening and transite partition on the south side was not replaced. Several days later (on September 28th), a foreman of the S. A. Lindstrom Company (sub-contractor engaged by Baton Construction Company to erect iron columns and beams on the building operation), found it necessary to weld to a column known as Column 12 a horizontal beam which, because of faulty manufacture, could not be bolted, as would normally have been done. This foreman, a certain Herbert Cox, ordered Edward Cooper, an employee of Lindstrom's and later to be the plaintiff in this litigation, to handle the welding job. Cooper, a structural iron worker of many years' experience, surveyed the scene and concluded that he could best accomplish the welding of the beam to the column by working from a "platform sling," a scaffold which would be suspended by means of four ropes wrapped around the upright column and attached to an overhead crossbeam.

Cooper climbed to the roof of the transformer room to get his bearings, explaining: "I had to change my scaffold to get in the proper position for welding on this point here (indicating), and I had to find out where I could change the lead of my rope; in other words, the two ropes, if you pull on one rope on one corner, it will sway your platform . . . where you can work conveniently." Having resolved on the plan he would follow in completing the task ahead of him, Cooper proceeded to slide down Column 12 to the place where he could begin his operation. As he slid past a point beneath the transformer room roof, disaster hit him. Although no part of his body touched the lurking bus bars, the 13,200-voltaged electric current leaped or arced from the copper tubing, enveloping his left shoulder in flames, striking him unconscious in the instant, and felling him to the concrete floor beneath. The resulting injuries from the heavy blow of the electricity and the impact with the cement pavement have permanently paralyzed him from the shoulders downwards. The gravity of Cooper's disability is evident from the jury's ensuing verdict of $112,000, the amount of which no one has questioned.

When Cooper sued the Heintz Manufacturing Company in trespass, Heintz brought in as additional defendants the Baton Construction Company, and the Lindstrom Company already described, as well as the Ortlip Company which had originally installed the transformers. The jury returned a verdict against all defendants. Upon the filing of motions for judgment n.o.v. by the respective defendants, the lower court exonerated Ortlip, but held Heintz, Baton and Lindstrom all guilty of negligence. In entering judgment the Court said: "Plaintiff may issue execution on the aforesaid judgment only against the original defendant Heintz Manufacturing Company. The maximum exe-

cution permissible on the judgment against Heintz is the total amount of the jury's verdict of $112,000 less such sums as have been paid to plaintiff under Workmen's Compensation for his injury. Upon such payment, the defendant Heintz Manufacturing Company is subrogated to plaintiff's rights under Workmen's Compensation. Defendant Heintz Manufacturing Company may not compel the additional defendants, Baton Construction Corporation and S. A. Lindstrom, Inc., to pay a greater sum by way of contribution than they are obligated to pay under Workmen's Compensation."

Only the Heintz Company has appealed from the decision of the lower Court. It argues for reversal on two grounds: (1) that no act of negligence has been proved against it; (2) that the plaintiff was guilty of contributory negligence. At the outset, Heintz maintains that the construction work, during the unfoldment of which Cooper was injured, was performed under conditions prescribed by the contractor Baton and that, therefore, Heintz is outside any orbit of responsibility in the matter. In support of its position Heintz cites *Valles v. Peoples-Pittsburgh Trust Co.,* 339 Pa. 33, where recovery was denied in a trespass action brought against the defendant bank as the result of an explosion which occurred in its basement during a repair job being done by an independent contractor. But in that case the independent contractor had full control of the repair operation. The intervention of the building owner was not only not required but might well have been legally interpreted as officious and intermeddling. Here, to the contrary, the building owner continued to exercise control over the damaging instrumentality (the lethal transformers) while the independent contractor was working. This proposition was well stated by the lower court in its able opinion: ". . . notwithstanding its employment of the contractors to do

the building in question, Heintz still controlled the flow of electricity into the transformer room. The very vital power room which controlled the flow of electricity remained in Heintz's control at all times. It was Heintz who determined when the electricity was turned on and off."

The defendant also cites in its behalf, *Engle v. Reider*, 366 Pa. 411, where the workman of an independent contractor, while installing a furnace in the defendant's home, was asphyxiated by carbon monoxide gas which escaped because of the defendant's failure to supply a vent in an already installed hot water heater on his premises. In view of the fact that the property owner there had positive knowledge of the fatal possibilities attendant upon the known defect in his hot water heater, it might be that the doctrine of the *Valles* case was carried to an expansion limit just short of the breaking point. However, regardless of any observation on that phase of the matter, the *Engle* case can still be distinguished from the one at bar because the jury in the *Engle* case returned a verdict for the defendant and the evidence demonstrated that the defendant exercised no control over the installation of the furnace by the independent contractor.

However, the Heintz Manufacturing Company stands on no authoritative ground at all when it cites *Grace v. Disston*, 369 Pa. 265, where an employee of an independent contractor was injured in the defendant's plant by some steel bars which fell on him because of alleged vibrations in the plant. In affirming the lower Court's entry of a judgment n.o.v. in that case, this Court said: "The work was performed under conditions prescribed by the contractor and after the owner removed all materials to clear the place to the satisfaction of the contractor, *the latter remained in sole control of the work location.*" (Emphasis supplied.)

It cannot be said here that Baton, Lindstrom, or Ortlip, individually or collectively, remained in sole control of the work location. Although the transformer tower was geographically within the confines of Baton's operations, it was still working for Heintz: it was still supplying electricity for buildings other than those in which Baton was working.

In distinguishing the *Valles* case from the one at bar, the lower Court accurately said: "Surrender of control is the core of the Valles decision." Accepting this premise, the defendant argues before us: "But if 'surrender of control is the core of the Valles decision,' we submit that Heintz had surrendered control of the transformer room exactly as the defendant in the Valles case had surrendered control. There is no evidence in the entire record that any Heintz employe was in or even near the transformer room during the entire time the construction work had been going on." This argument fails in both logic and logistics. A submarine commander does not escape responsibility for the sinking of a ship because he does not ride the torpedo with which he sends his victim to the bottom of the sea. The physical location of an electric transformer by no means establishes the identity of the person or firm controlling its operation. The magic of electricity so annihilates distances that an operator in one building can control an electric device in another building which may be located yards or even miles away. The employees of the Ortlip Company which threw the switch controlling the transformers acted under the instructions of Heintz. Wm. R. Govett, vice-president of Ortlip, testified: "Q. Any authority, you are telling us, to turn off the power would have to come from the Heintz Manufacturing Company to you? A. In each and every instance. Q. I beg your pardon? A. In each and every instance that was required." Indeed, once the accident had occurred,

Heintz placed a guard at the transformer tower. This evidence was correctly allowed by the lower Court not as indication of responsibility for the mishap, but for the purpose of demonstrating Heintz's control over the dangerous instrumentality.

The jury found, and the evidence supports the finding, that Heintz retained control of the transformer tower. Was Heintz then as vigilant as the circumstances required? In *MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, 396, we said: "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question."

Enigmatic as is the basic element of electricity, no one with the slightest mentality is ignorant of its vast potentialities for destruction. The degree of care required to protect people from this devastating element is no less than that required to prevent poisonous reptiles from breaking loose from their restraining enclosures. As the proprietor of ferocious beasts may not, by pleading excessive cost for confining them, escape liability for the loss of life occasioned by his savage wards, so also the owner of high-voltaged electric machinery may not avoid responsibility for the devastation caused through his failure to adequately guard such uninhibited devices. In *Fitzgerald v. Edison Electric Illuminating Co.*, 200 Pa. 540, 543, this Court said: "When human life is at stake the rule of due care and diligence require everything that gives reasonable promise of its preservation to be done regardless of difficulties or expense."

In the case of *Commonwealth Trust Company v. Carnegie-Illinois Steel Co.*, 353 Pa. 150, the plaintiff's

decedent suffered electrocution when he touched a steam shovel which came into close proximity to a high tension electric line carrying 6600 volts. Evidence was adduced to show that the defendant plant-owner was thoroughly aware of the closeness of the electric wires to the area in which employees of the sub-contractor were working and that the peril flowing from that proximity could have been averted by raising the wires. We said there that "clearly, there was sufficient evidence to present a question of fact for a jury on the issue of the company's negligence." We also pointed out: "A company using such a dangerous agency as high voltage electricity is bound to use the highest degree of care to avoid 'injury to every one who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them."*

The evidence in the case at bar reveals that Heintz could have removed at a comparatively small expense the danger presented by the transformers on its premises by (1) restoring the partition which it had removed; (2) by placing a guard in or close to the transformer room; (3) by displaying warning signs; or (4) by shutting off the power when workmen were in the immediate vicinity of the transformer tower.

Heintz insists that warning signs were posted, but the plaintiff denies this and he is supported in his denial by the testimony of several witnesses. At any rate the question was a factual one and it was resolved by the jury in favor of the plaintiff so that in considering the matter of judgment n.o.v. we are constrained to

---

\* The fact that this Court affirmed the compulsory nonsuit in the *Commonwealth Trust Company* case because of contributory negligence on the part of the decedent does not detract from the force of the authoritative utterance by the Court on the subject of negligence which was strictly in issue.

assume that Heintz allowed the hazard-fraught transformers to operate without admonitory notices.

In further attempted substantiation of its motion for judgment n.o.v., Heintz argues that the plaintiff is guilty of contributory negligence. We have stated repeatedly that the Court "can declare as a matter of law that a certain state of facts amounts to contributory negligence on the part of a plaintiff only in cases so clear that there is no room for fair and sensible men to differ on their conclusions from the available data."* No one could read the 365-page printed record in this case and fairly assert that there is no room for fair and sensible men to conclude from the evidence that the plaintiff was free of contributory negligence.

The defendant argues that there was no need for the plaintiff to go to the roof. The plaintiff was a seasoned structural iron worker and has explained why he made the trip in question. In the face of this explanation, which was fortified by other circumstances and accepted by the jury as reasonable, one cannot arbitrarily conclude that Cooper ascended to the roof for the purpose of obtaining fresh air.

Heintz further contends that the plaintiff could have accomplished his ends by taking a route other than the one he employed. It is suggested, for instance, (1) that he could have "boost[ed] himself up from beam A at which he was working, to the floor, to adjust his lines"; (2) that "he could have descended the ladder which rested against the cross-beam under the floor at the east side, and climbed up column 12 to the floor of the transformer room"; (3) that "he could have climbed up on this column and gotten on the scaffold." An active imagination can conjure up a score of courses Cooper might have followed, but these surmises are not

---

* *Caulton v. Eyre & Co.*, 330 Pa. 385, 390.

riveted to steel columns of facts; they are airy hypotheses that cannot serve as a platform upon which to build a finding of contributory negligence—certainly not a legal one.

When a workman in the discharge of his duties proceeds from a place where it is necessary for him to be to another place where it is necessary for him to go, the law will not proclaim him guilty of contributory negligence if he moves over a route unknown to him, in the exercise of his normal faculties, to be dangerous.

Heintz argues that it is an "inescapable inference" from the testimony of the witness Cox that the plaintiff ascended the roof "to get more material to finish the job." Even if this "inescapable inference" were to be accepted as imprisoned fact, it is not clear how it would taint the plaintiff's claim with a contributory negligence fatal to his cause.

Finally Heintz contends that Cooper contributed to the happening of the tragedy by voluntarily placing himself in a position of recognized peril. The record is replete with evidence that the bus bars in the transformer room were hidden behind a channel beam supporting the roof and that they were thus invisible to one not familiar with the equipment and the accessories in the transformer room. In the consideration of contributory negligence, what is not seen, where detection is dependent upon sight, is to be regarded as empty of peril and devoid of harm.

The evidence also confirms the plaintiff's testimony that he had not been warned that the transformers had been reactivated and were functioning in all their deadly power when, in the fulfillment of his superior's orders, he unwittingly crossed the dread confines of 13,200 volts of destructive electricity.

The case was ably tried, it was presided over with marked ability, the law was correctly applied, and we

see no reason to alter or disturb the conclusions reached by the Court below.

Judgment affirmed.