

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-2006

# Carcaise v. Cemex Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3053

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Carcaise v. Cemex Inc" (2006). *2006 Decisions.* Paper 460.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/460

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3053

———

DAVID S. CARCAISE;
LESLIE J. CARCAISE, his wife

v.

CEMEX, INC.,
                    Appellant

v.

INDUSTRIAL CONTRACTING
    AND ERECTING, INC.,
                    Third-Party Defendant


———

No. 05-3088

———

DAVID S. CARCAISE;
LESLIE J. CARCAISE, his wife

v.

CEMEX, INC.

v.

INDUSTRIAL CONTRACTING
    AND ERECTING, INC.,
                    Third-Party Defendant/Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 01-cv-00859)
District Judge: Honorable Terrence F. McVerry

———

Argued July 10, 2006

Before: SLOVITER, McKEE, and RENDELL, <u>Circuit Judges</u>

(Filed:   September 13, 2006)

———

Barbara S. Magen
Andrew J. Connolly   (Argued)
Post & Schell
Philadelphia, PA l9l03

William J. Conroy
William A. Rubert
Campbell, Campbell, Edwards & Conroy
Wayne, PA l9087

        Attorneys for Cemex, Inc., Appellant in No. 05-3053
                            Appellee in No. 05-3088

Francis X. McTiernan, Jr.
Jeffrey A. Kubay
Wayman, Irvin & McAuley
Pittsburgh, PA l5219

        Attorneys for Industrial Contracting and Erecting, Inc.,
                            Appellee in No. 05-3053
                            Third-Party Defendant/Appellant in No. 05-3088

Mark J. Homyak    (Argued)

The Homyak Law Firm
Pittsburgh, PA l5219

       Attorney for David S. Carcaise, Leslie J. Carcaise,
                        Appellees in Nos. 05-3053, 05-3088


OPINION


SLOVITER, Circuit Judge.

     Cemex, Inc. ("Cemex") appeals the adverse judgment against it following a jury

verdict of approximately $7 million awarded in favor of plaintiffs David Carcaise

("Carcaise") and his wife Lucy Carcaise as damages from an accident in which Carcaise

was grievously injured. The jury also found that Industrial Contracting & Erecting, Inc.

("ICE"), the third-party defendant, which was the company that assembled the machine in

which Carcaise was injured, was twenty-percent liable for the accident, and it also

appeals. The facts in this case are numerous and complex, but because the parties and the

District Court are familiar with them, we choose to discuss only those necessary to our

ultimate disposition.

**I.**

Facts and Procedural Posture

     Cemex is one of the largest manufacturers of cement in the United States. It

manufactures that cement, in part, from limestone that it extracts from its quarry in

Wampum, Pennsylvania. The limestone mined at Wampum Quarry is accessible only by

digging through hundreds of feet of earth called "overburden." Cemex uses large pieces

3

of digging equipment called "draglines" to remove the overburden from the limestone. Carcaise, an employee of Minserco, Inc., an independent contractor selected by Cemex, was injured when the 2100-ton piece of equipment at issue ("Dragline") tumbled seventy feet over the precipice into a ditch with Carcaise inside. Predecessor companies of Cemex owned Wampum Quarry and the subject Dragline at the time of the accident.

The Dragline sat on a bulldozer-made "bench" which had been leveled into a "pad," and dug the overburden (called "spoil") by lowering a "bucket" attached to a crane-like "boom" over the "dig face edge" which it filled and dumped over the "spoil side edge." Absent deficiencies in dragline design or construction, a dragline is stable so long as its distance from the spoil side edge is no less than its tub's radius. As a result of the fall, Carcaise suffered, inter alia, a fractured sternum and a burst fracture of his eleventh thoracic vertebra. Surgery on the injury to prevent paralysis was successful in stabilizing his spine, but rendered Carcaise impotent. A morphine pump was surgically inserted into Carcaise's lower abdomen to alleviate his ongoing pain, and this same surgical insertion procedure will have to be repeated approximately seven times over the course of his anticipated lifespan.[1]

Carcaise and his wife filed this diversity action against Cemex alleging that the accident happened due to unstable terrain conditions and inadequate ballasting of the Dragline. In its Answer denying liability, Cemex sought to fix responsibility on others

---

[1] No party has challenged the amount of damages awarded by the jury as excessive.

including Carcaise's co-worker, Robert Ahner, a specialist in dragline operation who was hired by Cemex as an independent contractor to train its employees to use the Dragline. Ahner was recalled by Cemex as an independent consultant in November 1994, and thereafter was hired by Minserco as Stripping Foreman. Cemex filed a Third-Party Complaint against ICE from whom it had purchased the Dragline, in which it alleged that ICE failed to assure the Dragline had sufficient ballast at the time it was disassembled, transported, and reassembled by ICE and that this failure was a proximate cause of the accident.

Following the trial, the jury found in favor of Carcaise in the amount of $6,400,000 and in favor of Mrs. Carcaise in the amount of $500,000. The jury determined that Cemex was 70% causally negligent, that ICE was 20% causally negligent, and that Carcaise was 10% causally negligent. The District Court molded the jury verdict by removing the 10% of the verdict attributable to Carcaise from the defendants' liability.

The District Court granted Carcaise's motion to add delay damages to the jury verdict, denied the post-trial motions filed by Cemex and ICE, denied Cemex's motion seeking to stay execution of the judgment, and entered a final, Amended Judgment in the amounts of $6,518,183.34 plus costs (i.e., the molded verdict plus delay damages) in favor of Carcaise and $450,000 in favor of Mrs. Carcaise (the molded verdict alone). Both Cemex and ICE filed timely notices of appeal.

**II.**

5

Cemex argues that the District Court erred in failing to grant Cemex's motion for a directed verdict because Cemex owed no duty to Carcaise through his independent-contractor employer, Minserco. The Pennsylvania Supreme Court has addressed the extent of control a landowner must exercise over the activities of an independent contractor in order for a trial judge to permit a jury to determine whether the landowner is liable. In Hader v. Coplay Cement Manufacturing Co., 189 A.2d 271 (Pa. 1963), the Pennsylvania Supreme Court established that "[a]n owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty to the employees of the independent contractor with respect to an obviously dangerous condition on that portion of the land in the possession of the contractor." Id. at 277. However, the Pennsylvania Supreme Court has recognized two exceptions to this rule. The first exception arises where the landowner "retains and exercises control over work, including construction work, entrusted to an independent contractor." Crane v. I.T.E. Circuit Breaker Co., 278 A.2d 362, 363-64 (Pa. 1971) (citing Restatement (Second) of Torts § 414). The second exception arises where an accident results from work involving a "peculiar risk of physical harm" or a "special danger." Phila. Elec. Co. v. Julian, 425 Pa. 217, 228 A.2d 669 (Pa. 1967) (citing Restatement (Second) of Torts §§ 416, 427).

In Hader, the Court amplified the control-of-work issue by enunciating the basic principle that an independent contractor's "responsibility replaces that of the [land]owner" only so long as the landowner did not "retain control of the . . .

6

instrumentality which caused the accident." Hader, 189 A.2d at 277. It cited its earlier opinion in Cooper v. Heintz Manufacturing Co., 122 A.2d 699 (Pa. 1956), where it held a landowner liable for injuries caused to the plaintiff from high-voltage transformers because the landowner retained "control over . . . the lethal transformers . . . while the independent contractor was working" amidst those transformers. Id. at 702. The Cooper Court found the landowner liable, holding, "It cannot be said . . . that [the contractor] remained in sole control of the work location" because, "[a]lthough the transformer tower was geographically within the confines of [the contractor's] operations, it was still working for [the landowner]: it was still supplying electricity for buildings other than those in which [the plaintiff] was working." Id. The Court also found it notable that the plaintiff "had not been warned that the transformers had been reactivated." Id. at 704.

The facts in this case, viewed in the light most favorable to Carcaise, were sufficient to allow a reasonable factfinder to find that Cemex did in fact exercise sole control of instrumentalities which caused the accident, namely: (1) the terrain at Wampum Quarry, and (2) the Dragline. Because the special interrogatories by which the jury issued its verdict did not ask the jury which particular instrumentality caused the accident, we must consider the sufficiency of the evidence for each instrumentality.

## A.

The 1996 contract between Cemex and Minserco ("Stripping Agreement") provided that Cemex would "[p]rovide and maintain . . . . [p]roper terrain area," and that Cemex would "[p]rovide [Minserco] access at all times to the machine, service and repair

7

facilities and machine records." App. at 3693. After hiring Minserco, Cemex continued to use employees or independent contractors other than Minserco to perform all activities at the mine other than actual Dragline operation. Of particular relevance, Cemex "conducted deep boring tests of the soil," App. at 53, which Cemex Superintendent Kuiken testified were necessary "to make sure that you have limestone underneath there and what type of material you will be going through." App. at 682. Sometimes, the test drill borings "uncovered . . . fresh running springs in what appeared to be an otherwise dry bench under the surface." App. at 683.

Kuiken testified that he served as the intermediary between Minserco and the independent contractors responsible for conducting test drill borings at Wampum Quarry. Kuiken would warn Minserco whenever borings discovered substrata water at an upcoming dragline operation site. App. at 684. A reasonable factfinder could conclude that he warned Minserco in furtherance of Cemex's duty to "[p]rovide and maintain . . . [p]roper terrain area." App. at 3693. As Cemex itself argues, "according to Mr. Kuiken, the decision where the [D]ragline is to be positioned is where the operator believed that it was safe to operate, <u>given the conditions</u>." Cemex Appellant Br. at 28 (emphasis added). Minserco operators could not know where substrata terrain "conditions" made it unsafe to operate without warning from Cemex.

Kuiken testified that he did not "know if [pre-accident test drill borings] were ever done" in the area of the accident. App. at 682. He had not directed anyone to test for water in that area. After the accident, Cemex discovered "a large concentration of mud

8

and water" in the earth underneath the bench where the accident occurred and blasted the substrata to expel the water. App. at 686-87. It took approximately one month for the subsurface water to drain out.

As in Cooper, where the plaintiff "had not been warned that the transformers had been reactivated," Cooper, 122 A.2d at 704, Minserco was not warned about the conditions of the terrain at the accident site. Therefore, the circumstances at bar except Cemex from landowner immunity. As the Cooper Court observed, "A submarine commander does not escape responsibility for the sinking of a ship because he does not ride the torpedo with which he sends his victim to the bottom of the sea." Id. at 702.

As to the condition of the Dragline, there was sufficient evidence from which a fact finder could conclude that the machine was unbalanced when provided to Minserco and that this lack of balance contributed to the accident. Employees of Cemex testified that the ballast on the Dragline was "rusty," App. at 589, and had "deteriorated to the point that it looked like talcum powder. It wasn't heavy enough." App. at 1034. Some chambers in the ballast of the Dragline that are normally filled with small pieces of metal were empty, and metal pieces present in the ballast were unevenly distributed throughout the ballast chambers. Ahner, who was then working for Cemex while training Cemex employees in the use of the Dragline, noticed that the Dragline was "[f]ront end heavy," would rock in an unusual manner, and would sink too quickly into earth. App. at 751. When Cemex salvaged the Dragline from the mud in the spoil pit after the accident, it was determined that the ballast of the Dragline was more than 200,000 pounds (approximately

9

30%) underweight.

Ahner did not advise Cemex of the lack of balance. Instead, he sought to adjust for the problem by instituting a practice of sloping the pad upward toward the spoil side edge so that the Dragline might come to sit on a horizontally level surface after compressing the elevated edge. Sometimes, however, this method would not result in a level horizontal pad, and the sloping process would have to be repeated.

In response to a question from a Cemex employee about Cemex's practice of elevating the spoil side edge, the manufacturer of the Dragline wrote a letter to Cemex, stating that "[t]he operation manual for your 7820 states that the machine should be on level ground during operation." App. at 348. Neither this letter nor its contents were communicated to Ahner.

Based on the evidence on record, we conclude that the District Court did not err in submitting the control-of-work issue to the jury.

**B.**

In addressing the second exception to owner non-liability, that for work involving a "peculiar risk of physical harm" or "special danger," the Pennsylvania Supreme Court has relied on Restatement (Second) of Torts § 416, "Work Dangerous in Absence of Special Precautions." That section provides:

> One who employs an independent contractor to do work which the
> employer should recognize as likely to create during its progress a peculiar
> risk of physical harm to others unless special precautions are taken, is
> subject to liability for physical harm caused to them by the failure of the
> contractor to exercise reasonable care to take such precautions, even though

10

the employer has provided for such precautions in the contract or otherwise. Thus, in Julian, the Court held that a possessor of land (in that case a contractor) was subject to liability for injuries sustained by its subcontractor when that subcontractor struck a hidden gas main imperceptible from the surface of the earth because the contractor failed to advise the subcontractor of the main's location. 228 A.2d at 670 (citing Restatement (Second) of Torts §§ 416, 427).

Cemex argues that the risk of a dragline tumbling into a spoil pit is an ordinary risk of dragline operation. Normally, precautions "any careful contractor could reasonably be expected to take . . . are the responsibility of the contractor," Restatement (Second) of Torts § 413, cmt. b, but where a landowner has superior knowledge of special dangers and fails to warn the independent contractor of the danger, the risk involved is necessarily peculiar to the relationship between the parties: "employers with superior knowledge of special dangers have a duty to warn independent contractors." Toole v. United States, 588 F.2d 403, 408 (3d Cir. 1978).[2]

---

[2] Cemex claims that "Minserco was in the business of performing the operation of the [D]ragline, and the preparation of the bench, and therefore was in a better position than Cemex to know of the dangers associated with the work." Cemex Appellant Br. at 42. However, Minserco did not have the tools necessary to determine substrata conditions imperceptible from the bench. Tests to determine such conditions were conducted by Cemex. Moreover, a reasonable juror could find that the Stripping Agreement (supported by the conduct arising out of it) established a relationship in which Minserco relied upon Cemex for warnings in cases of substrata instability. Because an established practice of warning and failure to warn under the particular circumstances was

11

Here, Cemex "anticipate[d] the need for some specific precaution," Restatement (Second) of Torts § 416, cmt. a, with regard to the risk of substrata pockets of water. Moreover, Cemex knew that "the particular method . . . [Minserco would] adopt" involved maintaining a high degree of proximity to the spoil side edge absent warning of substrata instability. Id., § 416 cmt. e; see id. § 427, cmt. b, c. Therefore, a heightened risk that the Dragline would tumble into the spoil pit was one Cemex should have "recognize[d] as likely to arise" where Cemex failed to assure the terrain was stable at a dragline site and failed to warn Minserco that said terrain remained untested. Id. § 416, cmt. e.

We reject Cemex's argument that whether there was a "peculiar risk" was an issue for the judge and not for the jury. Once the judge determined that a reasonable juror could construe the risk as a peculiar risk, whether it was in fact a "peculiar risk" is an issue properly submitted to the jury. See Sirianni v. City of Phila., 506 A.2d 868, 871 (Pa. 1986); Julian, 228 A.2d at 670-71; Brletich v. U.S. Steel Corp., 285 A.2d 133 (Pa. 1971); see also McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356 (1991). The District Court did not err in doing so in this case.

## C.

Cemex objects to the jury instructions on the control-of-work issue and to the

---

not at issue in some of the Pennsylvania intermediate and lower court cases cited by Cemex, their outcomes are inapposite. See, e.g., Drum v. Shaull Equip. & Supply Co., 787 A.2d 1050 (Pa. Super. Ct. 2001), appeal denied, 803 A.2d 735 (Pa. 2002).

instruction regarding the peculiar risk doctrine. It objected to the jury charge on the control-of-work issue at the Friday afternoon charging conference but did not suggest alternative language to the jury instructions recommended by the Carcaises. On Monday morning, the District Court ruled in favor of submitting the Carcaises' suggested language to the jury. Cemex responded that it "would suggest . . . that there be two <u>additional</u> instructions given to help clarify the issue for the jury," App. at 1974 (emphasis added), but again did not suggest any alternative language on the control-of-work or peculiar risk issues. Rather, it noted as to control of work that "the jury needs <u>further</u> clarification" and, as to peculiar risk, that "ordinary negligence isn't enough to trigger [the peculiar risk] doctrine." App. at 1975 (emphasis added). Cemex proposed <u>additional</u> instructions, which the District Court submitted to the jury along with the Carcaises' proposed instructions. After the jury was charged, Cemex's counsel again objected to the Court's submission of the Carcaises' language to the jury, but did not object to any specific language. Cemex's post-trial motion also did not object to any specific language.

We review for plain error because: (1) Cemex did not raise below the issue of exercise of control as distinguished from retention of control or point to any specific language that would suggest a problem with this distinction in the District Court's instruction, and (2) both in the District Court and on appeal, Cemex has failed to object to any specific language in the jury charge on peculiar risk. <u>See</u> <u>Ryder v. Westinghouse Elec. Corp.</u>, 128 F.3d 128, 136-37 (3d Cir. 1997).

13

The Carcaises concede that the language disputed by Cemex with regard to the issue of control of work, "[t]aken out of context," constituted a misstatement of the law because "the jury would have been able to find Cemex liable for Minserco's negligence without Cemex's negligent exercise of its retained control." Carcaise Br. at 43; see Byrd v. Merwin, 317 A.2d 280, 281-82 (Pa. 1974). However, the Carcaises contend that the District Court's instructions on the whole properly stated the applicable standard.

After giving the contested jury instruction on control of work, the District Court stated, "A company that entrusts work to an independent contractor, but who retains the control over any part of the work, is subject to liability for physical harm to others caused by its failure to use control with reasonable care." App. at 2097 (emphasis added). This is in direct conflict to the portion of the jury charge disputed by Cemex. Therefore, viewing the jury instructions as a whole, one could conclude that the District Court corrected its previous error. Because it is not "plain" on the face of the record that the Court erred, Cemex's challenge to the charge on appeal cannot survive plain error review.

As to the issue of peculiar risk, on appeal Cemex merely restates its argument that because "there [wa]s no evidence that the risk [wa]s different from the usual and ordinary risk associated with" Dragline operation, "this risk could **not** constitute a peculiar risk of harm." Cemex Appellant Br. at 48. We reject this argument for the same reasons set forth above.

## III.

ICE's Appeal

14

## A.

In its appeal, ICE relies on a release that Cemex executed on January 17, 2001 as part of a "Settlement Agreement and . . . Release" ("Release") in connection with a 1995 state-court action (the "prior litigation") concerning an alleged "catastrophic failure"of the same Dragline at issue here. Cemex's complaint against ICE in the prior litigation ("LC Complaint") described the 1995 "catastrophic failure" as follows:

> On or about February 21, 1995, while the DRAGLINE was being used by [CEMEX] under normal and expected operating conditions and for its ordinary intended purpose, the DRAGLINE suffered a catastrophic failure. The DRAGLINE failure event, which involved the rotating or swing mechanism, was as follows:
>
>> The bolts (or cap screws) holding the retainer plate and pinion gear to the shaft on the #4 swing assembly failed; that allowed and caused the pinion gear to fall from the lower end of the main rotating shaft; as the machine rotated, the pinion gear was then dragged, rubbing, over the top surface of the tub baseplate, with the pinion teeth still engaged in the swing rack, until the pinion became positioned over an opening in the baseplate that was normally used to remove and install the pinion gears; at that point, the pinion partially fell into the opening, becoming hung up there, and the DRAGLINE came to a sudden stop, tearing and buckling plates in the base, damaging the rack, swing bearing, and swing shaft, tearing up two of the twenty gear segments, and resulting in other associated damages.
>
> The above-described DRAGLINE failure of February 21, 1995, required repairs to the DRAGLINE, and caused it to be unavailable for use until repaired.

App. at 2229-2230 (¶ 11). The Release was signed after Carcaise's accident, but before the Carcaises filed suit in the present case.

In Pennsylvania, general releases are interpreted according to principles of contract construction. Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir. 1975).

15

In Three Rivers Motors, we endorsed the "rule of construction" that releases should be construed narrowly, i.e., that "words of a release should not be construed to extend beyond the express consideration mentioned so as to make a release for the parties which they never intended nor contemplated." Id. at 895-96.

The Release Cemex signed states, in relevant part:

> For and in consideration of the payment provided for herein, the sufficiency of which is hereby acknowledged, the Releasing Parties, being of lawful age, do hereby . . . release, acquit and forever discharge the Released Parties . . . from any and all known or unknown past, present or future claims, . . . causes of action, . . . lawsuits, [etc.] . . . and/or claims of any nature whatsoever or based upon any theory which the Releasing Parties now have or which hereinafter may accrue to the Releasing Parties . . . because of, on account of or in any way growing out of, resulting from or to result from or to result from the incident, accident, casualty or events which are more fully described in the [LC] Complaint . . . .

App. at 2246-47 (emphasis added).

It is clear that the "catastrophic failure" described in ¶ 11 of the LC Complaint is the event contemplated by the parties when the Release was drafted. Indeed, in his Report and Recommendation later adopted by the District Court, the Magistrate Judge concluded that "the 'accident, casualty or event' described [in the Release]" consists only of "the 'catastrophic failure' of the [D]ragline in February 1995." App. at 3598.

It is true, as ICE argues, that the language of the Release is broad. Cemex "expressly waive[d] and assume[d] the risk of any and all claims for damages which exist[ed] as of" January 2001, App. at 2249-50, and Carcaise's claim for damages existed as of January 2001. Moreover, the Release provides that this waiver be enforced even if Cemex did not realize it had a claim against ICE that "would [have] materially affect[ed]

16

[Cemex's] decision to enter into this Settlement Agreement and Release."  App. at 2250.

However, this broad waiver applies only to the "events" in the LC Complaint, and

allegations that ICE improperly reassembled the Dragline, contained in paragraph 15 of

the LC Complaint, are not an "event" within the natural meaning of that term.

Because the Release was entered into fifteen months after Carcaise's accident, ICE

was on notice that it should explicitly include in the Release reference to the reassembly

of the Dragline if it hoped to encompass claims related to accidents other than the 1995

"catastrophic failure."  Although Cemex could have introduced language to the Release

limiting it to the events "of 1995," cf. Harrity v. Med. Coll. of Pa. Hosp., 635 A.2d 5, 11

(Pa. Super. Ct. 1994) (release stating clearly that it applied to events "arising out of an

accident which occurred June 22, 1986"), it was under no obligation to limit the release in

this way because, interpreted narrowly, the terms of the Release unambiguously refer

only to the 1995 "catastrophic failure" of the Dragline.

**B.**

ICE argues that the trial court erred in permitting the jury to speculate as to the

weight of the Dragline's ballast at the time of the accident.  ICE contends that because

none of the evidence presented at trial in the present case included testimony as to

underballasting of the Dragline immediately after reassembly, Cemex has not met its

burden to eliminate other possible causes of the accident, and thus the issue of ICE's

liability should not have gone to the jury.

Several Cemex employees testified that the ballast appeared to be in terrible shape

17

upon reassembly, providing "enough independent evidence of a defect" in the Dragline at that time. Wojciechowski v. Long-Airdox Div. of Marmon Group, Inc., 488 F.2d 1111, 1117 (3d Cir. 1973). They testified that the used ballast on the Dragline Cemex purchased "looked like talcum powder. It wasn't heavy enough." App. at 1034 (Moser). There was testimony that many of the ballast chambers were underfilled or empty and that the distribution of metal pieces across chambers in the ballast was improper. Moreover, Ahner testified that while training Cemex employees in the use of the Dragline he noticed that it was "[f]ront end heavy," App. at 751, would rock in an unusual manner, and would sink too quickly into earth. Therefore, submission to the jury of the question of reassembly underballasting was proper. As in Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969), "there was indeed sufficient evidence to satisfy reasonable and well balanced minds that a defect existed" before the accident. Id. at 90.

## C.

ICE argues the District Court erred in denying ICE's Supplemental Motion for Summary Judgment in which it argued that Cemex's negligence claim was barred by Pennsylvania's "gist of the action" doctrine.

> Under the "gist of the action" test, to be construed as a tort action, the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral. . . . [T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.

18

Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001) (punctuation and citations omitted); see also eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002). In eToll, the court explained that the gist of the action doctrine bars tort claims

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

eToll, 811 A.2d at 19 (citations and quotation marks omitted).

Assuming arguendo that the gist of the action doctrine will be adopted by the Pennsylvania Supreme Court, it is inapplicable here. As the court explained in American Guarantee & Liability Insurance Co. v. Fojanini, 90 F. Supp. 2d 615 (E.D. Pa. 2000), the gist of the action "test is, by its own terms, concerned with the nature of the action as a whole. . . . [It] is a general test concerned with the 'essential ground,' foundation, or material part of an entire 'formal complaint' or lawsuit." Id. at 622 & n.12 (emphasis added). In a contribution/indemnification claim brought as a third-party claim in a personal injury suit, the "gist of the action" is necessarily in tort because, absent extraordinary circumstances, the nature of the action as a whole is in tort.

Cemex did not make any claim for damages on the basis of its own loss incurred as a result of improper Dragline reassembly. The liability alleged in the third-party complaint attaches only upon a damages award in favor of Carcaise. By demanding damages only if personal injury resulted from ICE's negligence, the third-party complaint

19

focuses on ICE's duty to have reassembled the Dragline to make it safe for operation. This is a matter of social policy – i.e., as a society we want those fixing dangerous machines to exercise due care – and therefore lies in tort.

**D.**

ICE contends Cemex's third-party contribution claims were barred by the applicable statute of limitations. The six-year limitations period for a common law contribution action under 42 Pa. Cons. Stat. § 5527 commences "from the entry of judgment against the joint tortfeasors" in favor of the original plaintiff. Pa. Nat'l Mut. Cas. Ins. v. Nicholson Constr. Co., 542 A.2d 123, 126 (Pa. Super. Ct. 1988); accord Kitchen v. Borough of Grampian 219 A.2d 685, 686 (Pa. 1966). The "statute of limitations on the [original] plaintiff's cause of action is irrelevant." Hileman v. Morelli, 605 A.2d 377, 382 (Pa. Super. Ct. 1992).

In Donegal Mutual Insurance Co. v. Grossman, 195 F. Supp. 2d 657 (M.D. Pa. 2001), the court explained that where a "[third-party plaintiff's] claims against [a third-party defendant] are derivative of [the original plaintiff's] claims against the [third-party plaintiff,] . . . . third-party claims do not accrue until judgment is entered on the original claim." Id. at 664. The court explained that third-party claims are considered "derivative," and "the Third-Party Defendants [would] be potentially liable to" the third-party plaintiffs "only if [the original plaintiff] recovers damages against the [third-party plaintiffs]." Id. (emphasis added). In the present case, Cemex's claims against ICE are derivative of the Carcaises' claims against Cemex because all of the damages claimed by

20

Cemex in the Third-Party Complaint are entirely dependent upon the entry of judgment in favor of the Carcaises. See App. at 2163 ¶ 25 (claiming a right to contribution only "[i]f the [Carcaises] prove any of the claims and alleged injuries and/or damages set forth in their Complaint"). It follows that the District Court did not err in rejecting ICE's statute of limitations argument.

**E.**

ICE argues that the District Court committed an error of law in requiring ICE to pay a pro rata share of delay damages imposed in favor of Carcaise because Cemex failed to file a written request for delay damages. Review for this alleged error of law is plenary. Knight v. Tape, Inc., 935 F.2d 617 (3d Cir. 1991). As this court has previously noted, "Under Pennsylvania practice a third-party defendant is termed an 'additional defendant' and is considered to be as directly liable to a plaintiff as if he originally had been named as a defendant. Thus, a party joined as an additional defendant in a Pennsylvania court is required to bear a proportionate amount of the plaintiff's delay damages under Rule 238(a)(1)." Id. at 630 (citing Pa. R. Civ. P. 2255(d)).

The District Court attributed seven ninths (7/9) of the total delay damages to Cemex and two ninths (2/9) to ICE (90% of total liability was attributable to both Cemex and ICE). However, because the defendants were jointly and severally liable, the District Court entered judgment against Cemex alone for the total judgment amount. The District Court added the following sentence to the Amended Verdict: "Cemex[] may hereafter have judgment against [ICE] for the amount which it proves it has paid to plaintiff David

21

S. Carcaise in excess of [Cemex's portion of the damages.]" App. at 22; cf. Smith v. Whitmore, 270 F.2d 741, 745 (3d Cir. 1959) (a third-party plaintiff has a cause of action against a third-party defendant when the third-party plaintiff has paid its pro rata share of the judgment).

ICE contends that Cemex failed to comply with Rule 238 of the Pennsylvania Rules of Civil Procedure because it failed to file a written request for delay damages after Carcaise filed such a request. Rule 238 provides that a "plaintiff may file a written motion requesting damages for delay and setting forth the computation" if s/he does so "[n]ot later than ten days after the verdict or notice of the decision." Pa. R. Civ. P. 238(c). ICE's argument is without merit. On its face, Rule 238 does not require a defendant to follow a plaintiff's written request for delay damages with a separate written request for contribution to delay damages, and ICE cites no case law that would support this.

ICE alternatively argues that the District Court failed to apportion delay damages properly between Cemex and ICE. Pennsylvania Rule of Civil Procedure 238(a)(2) provides that the total amount of "[d]amages for delay shall be awarded for the period of time from a date one year after the date original process was first served in the action up to the date of the award, verdict or decision." This rule applies equally to defendants in the underlying action and third-party defendants. Knight, 925 F.2d at 633 n.14. Therefore, the proportion of delay damages attributable to ICE was properly calculated for the same time-period as the proportion attributable to Cemex.

Because both Cemex and ICE are liable for delay damages accrued during the

22

same time-period and the District Court apportioned damages according to the liability proportions found in the jury verdict, the District Court did not err.

## F.

ICE contends Cemex is not a real party in interest and therefore had no standing to bring its claims at bar. ICE argues that Cemex has not presented sufficient evidence that Medusa, ICE's co-party to the Construction Contract, was Cemex's predecessor in interest. Cemex responds that ICE waived this claim. However, "[l]ike any jurisdictional requirement, standing cannot be waived." Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 n.5 (3d Cir. 1997).

ICE argues that there is "no evidence that Cemex was assigned any rights under the [Construction Contract] between Medusa and ICE." ICE Br. at 56. Cemex presented the Affidavit of Keith Nicholson, "Litigation Counsel for Cemex Inc.," App. at 3737, who stated that (a) "[o]n June 30, 1998 the entity known in [the Construction Contract] as Medusa Corporation was merged with a subsidiary of Southdown, Inc.," (b) "[e]ffective September 29, 2000, a subsidiary of Cemex purchased Southdown, Inc.'s stock and then merged with Southdown, Inc.," (c) "[e]ffective February 28, 2001, Southdown Inc. changed its name to Cemex, Inc.," and (d) "[t]he entity formerly known as Medusa Corporation is now known as Cemex, Inc." App. at 3737. Based on this affidavit, the District Court held that "Cemex is in fact '[a] real party in interest' with respect to the ICE/Medusa contract." App. at 2434.

ICE offers no evidence to support its assertion that Cemex does not have standing

23

in the present case. ICE claims the statements in Nicholson's affidavit are insufficient to establish standing because "[t]he mere fact that Medusa may have merged with a subsidiary of a predecessor corporation of Cemex is not evidence that it is a real party-in-interest to the [Construction Contract]." ICE Br. at 57. However, the Supreme Court of Pennsylvania has noted that "[i]t is well established law in the Commonwealth that when corporations merge the surviving corporation succeeds to both the rights and liabilities of the constituent corporation." LTV Steel Co. v. Workers' Comp. Appeal Bd. (Mozena), 754 A.2d 666, 677 (Pa. 2000) (citing 15 Pa. Const. Stat. § 1929). The Nicholson Affidavit was sufficient evidence upon which the District Court could base its finding that Cemex is the successor-in-interest to the rights and liability of Medusa under the Construction Contract. The District Court did not err.

## IV.

### Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.

---